## STATE v. LARRY CARL LASLEY.

236 N. W. 2d 604.

November 21, 1975—No. 45464.

C. Paul Jones, State Public Defender, Peter J. Thompson, and Patrick Delaney, for appellant.

Warren Spannaus, Attorney General, Gary W. Flakne, County Attorney, and Vernon E. Bergstrom, Michael McGlennen, and David W. Larson, Assistant County Attorneys, for respondent.

Wetherbee & Baker, R. Michael Wetherbee, and Randall Tigue, for Minnesota Civil Liberties Union, amicus curiae, seeking reversal.

OTIS, JUSTICE.

This is an appeal from a conviction for robbery, aggravated assault, and murder in the first degree. Defendant asserts as grounds for reversal (1) the court's refusal to conduct a psychiatric examination of a victim who testified; (2) the receipt in evidence of hearsay testimony corroborating a victim's identification of defendant; and (3) the court's refusal to suppress evidence removed from his home without a search warrant.

The crimes which gave rise to this prosecution occurred on February 19, 1974, at about 10:30 p.m., at the home of Mrs. Della Ross in North Minneapolis. At that time, Mrs. Ross and her tenant, William Vaughn, were in her kitchen when there was a knock at the back door. Vaughn opened the door, and two in-

truders pushed past them, brandishing a gun. Vaughn and Mrs. Ross were forced to lie on the floor, and their hands were tied with wire coat hangers. A trunk containing money was opened. Thereafter, one of the intruders, later identified by Vaughn as defendant, shot both Mrs. Ross and Vaughn with his revolver, killing Mrs. Ross and wounding Vaughn in the neck.

Within 10 minutes of the shooting, Vaughn disengaged his hands and called the police, who reached the scene a few minutes later. Upon their arrival, Vaughn was conscious and able to identify his assailant as "Nettie's husband." He also gave the police a physical description of the robbers.

In searching the premises, the police found a .32-caliber revolver in the alley in the middle of the block behind the house. The revolver was sunk in ice, suggesting it was warm when dropped. Although the bullet which killed Mrs. Ross could not be identified as coming from the revolver, a comparison of the firing pin impression on a misfired cartridge found in defendant's apartment with the firing pin impressions on cartridges test-fired from the revolver led an expert to conclude that the firing pin impression on the misfired shell was produced by the revolver.

Vaughn was taken to General Hospital where he was interrogated by the police about 11:15 p.m. He related to them that the assailant had recently been released from prison, which information prompted the police to secure photographs of persons fitting that category. Defendant's picture was not included in this group, but upon viewing them Vaughn recalled that Nettie's last name was Lasley and her husband's name was Larry. The police thereupon secured a picture of defendant which Vaughn identified as a photograph of his assailant.

In searching Mrs. Ross' home a little after midnight, the police discovered an address book which contained the name "Nettie Lasley" together with a phone number from which they were able to trace the Lasley address to Apartment 301 at 1031 Bryant Avenue North, Minneapolis. Following this discovery, five police

officers converged on the Lasley apartment, arriving there at 1:27 a.m. Mrs. Lasley answered the door, and although she objected to having the police enter the apartment, they persuaded her that they had authority to do so. The officers then searched the apartment. Two later testified that their sole purpose was to determine whether defendant was hiding there. Unable to find him, they interrogated Mrs. Lasley to determine where her husband was, where he was apt to be found, who his friends were, what kind of an automobile he owned, and whether he had recently been released from prison. The officers remained until 2:14 a.m. As they were departing, one of the officers observed four .32-caliber bullets on an end table next to the sofa where he and Mrs. Lasley had been conversing. He took the cartridges with him and had laboratory tests made. The tests demonstrated that one had been in the chamber of the .32-caliber revolver found behind the home in which the shooting occurred. As the officers left the Lasleys' apartment building, defendant arrived in a car and was apprehended.

Defendant here argues not only that the .32-caliber cartridge was inadmissible, but that the identification testimony was inadequate to convict him because it was conclusively impeached by proof that Vaughn was mentally incompetent and there was no other evidence to sustain a conviction. In support of these arguments, defendant points out that no scientific evidence proved that the .32-caliber revolver was the weapon used in the shooting; footprints found in the snow were not those of defendant; no fingerprints connected defendant with the shooting; no money was missing from Mrs. Ross' trunk, and defendant was found with only $68 on his person; and a "neutron activation test" to determine whether defendant had recently handled a firearm was inconclusive. It is clear that the cartridge found in Lasley's apartment and Vaughn's identification testimony constituted the critical evidence of guilt on which the conviction was based. We hold that such evidence was competent and admissible, and accordingly affirm.

1. Defendant asserts that it was error for the trial court to deny a motion requiring Vaughn to submit to a psychiatric examination, and that his mental condition rendered his testimony inadmissible. It is undisputed that Vaughn was an alcoholic who had undergone intensive treatment and suffered from severe mental deterioration. His testimony on virtually every detail except that of identification was inconsistent and confused. Nevertheless, on the critical question of identity he remained steadfast in his assertions that his assailant was "Nettie's husband or boyfriend," that he had recently been released from prison, and that he was someone with whom he, Vaughn, was acquainted. There was testimony by another witness that on February 14 he and Vaughn were present when defendant and Nettie Lasley were at the Ross home negotiating the purchase of a tape recorder by Mrs. Ross from defendant. In defendant's presence, Mrs. Ross opened a trunk and paid him $26. Subsequently, a dispute arose as to whether the tape recorder functioned properly, and apparently Lasley replaced it. After her death the trunk was found to contain over $700. The sale had occurred only 5 days before Mrs. Ross was murdered.

However confused Vaughn may have been on all the other details, it is not unreasonable to believe that, having survived the terrifying experience which nearly cost him his life, he would, if he knew the defendant, struggle to recall his name. Vaughn's inability to recall the sequence of events, disclosed on cross-examination, was a matter which the jury could assess in weighing his testimony. We are not persuaded that it was not entitled to credence with respect to the identification issue. Two judges passed on Vaughn's ability to testify, and both determined that he was competent to do so. We are satisifed that the evidence sustains their decision, and that it was not error to refuse to exclude such testimony under Minn. St. 595.02(6). This is a determination peculiarly within the discretion of the trial court. State ex rel. Dugal v. Tahash, 278 Minn. 175, 153 N. W. 2d 232 (1967); State v. Whelan, 291 Minn. 83, 189 N. W. 2d 170 (1971).

2. The trial court permitted police officers to testify to Vaughn's conversations with them in which he identified defendant as his assailant. Although the court treated these statements as part of the res gestae, we need not determine whether they were admissible under that exception to the hearsay rule. We are of the opinion that it is always competent to show that a victim consistently identified the person charged with the crime under circumstances where the person making the identification is a witness at the trial, under oath, and subject to cross-examination.

3. The court's refusal to suppress evidence removed from defendant's home raises a serious Fourth Amendment question not yet resolved by the United States Supreme Court. Defendant contends (1) that there was not probable cause for the police to believe that he could be found in his apartment when they arrived at 1:27 a.m. following the murder of Mrs. Ross, and they therefore had no right to enter without a warrant; and (2) that even if they had a right to enter, upon determining that defendant was not in the apartment, it was their duty to depart immediately and any interrogation of Mrs. Lasley should thereafter have been conducted elsewhere.

Minn. St. 629.34(3) permits a peace officer to make an arrest without a warrant "[w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it." The statute further provides:

"To make such arrest the officer may break open an outer or inner door or window of a dwelling house if, after notice of his office and purpose, he shall be refused admittance."

Applying that statute, we held in State v. Bean, 280 Minn. 35, 157 N. W. 2d 736, certiorari denied, 393 U. S. 1003, 89 S. Ct. 493, 21 L. ed. 2d 468 (1968), that where police officers had probable cause to believe that defendant had committed a felony, they were justified in using force to enter defendant's home without a warrant to effectuate an arrest and that the revolver and shot-

guns which they came upon were properly seized. Although here the officers were not required to use force, the statute permitted them to enter defendant's apartment in search of him.

Defendant would have us suppress the cartridge found in his home on the authority of United States v. Goldenstein, 456 F. 2d 1006 (8 Cir. 1972). In that case, the United States Court of Appeals held that where an officer entered a hotel room in search of a registered guest who allegedly had shot another guest in the hotel minutes before and had been wounded himself, it was the officer's duty, after determining that no one was present, to make no further search. Accordingly, the court ordered the suppression of evidence consisting of money found in a sealed suitcase. We believe, however, that Goldenstein is distinguishable. There, the evidence was not in plain sight, and there was no justification for remaining in the hotel room. Here, on the other hand, the cartridge was in plain view on the end table, and we are of the opinion the police committed no violation of the Fourth Amendment in remaining long enough to interrogate Mrs. Lasley.

In a recent United States Supreme Court case, Gerstein v. Pugh, 420 U. S. 103, 114, 95 S. Ct. 854, 863, 43 L. ed. 2d 54, 65 (1975), Mr. Justice Powell, citing a footnote in the dissent of Mr. Justice White in Coolidge v. New Hamphire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. ed. 2d 564 (1971), stated:

"The issue of warrantless arrest that has generated the most controversy, and which remains unsettled, is whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest."

Mr. Justice White had made the following observation (403 U. S. 512, 91 S. Ct. 2061, 29 L. ed. 2d 609):

"* * * But, as a constitutional matter, the Court has never held or intimated that all probable-cause arrests without a warrant in the home must be justified by exigent circumstances other than the necessity for arresting a felon, or that, if the

elapsed time between the accrual of probable cause and the making of the arrest proves sufficient to have obtained a warrant, the arrest is invalid."

In the earlier case of Maryland Penitentiary v. Hayden, 387 U. S. 294, 298, 87 S. Ct. 1642, 1646, 18 L. ed. 2d 782, 787 (1967), the Supreme Court articulated its reasons for approving seizure of evidence by police officers while searching a suspected robber's home in hot pursuit of him:

"* * * The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

"* * * Here, the seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape."

Subsequently, in Coolidge v. New Hampshire, *supra,* members of the court in a number of separate opinions further explicated their views on searches made without a warrant while in "hot pursuit" of a fleeing suspect. The court held that where an otherwise lawful search is in progress, and the police inadvertently discover evidence, it might be inconvenient and sometimes dangerous—both to the evidence and to the police—to require them to ignore it until they have obtained a warrant. The court stressed, however, that the discovery of evidence in plain view must be inadvertent.

In the Coolidge case, the defendant's wife voluntarily made available to the police items of clothing and guns which subse-

quently implicated defendant in the crime. Although the case was reversed on other grounds, the court had this to say on the subject of the interrogation of defendant's wife and her cooperation with the police (403 U. S. 487, 91 S. Ct. 2049, 29 L. ed. 2d 595):

"In a situation like the one before us there no doubt always exist forces pushing the spouse to cooperate with the police. Among these are the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse. But there is nothing constitutionally suspect in the existence, without more, of these incentives to full disclosure or active cooperation with the police. The exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct. They are 'to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' *Elkins v. United States,* 364 U. S. 206, 217. But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. If, then, the exclusionary rule is properly applicable to the evidence taken from the Coolidge house on the night of February 2, it must be upon the basis that some type of unconstitutional police conduct occurred.

"Yet it cannot be said that the police should have obtained a warrant for the guns and clothing before they set out to visit Mrs. Coolidge, since they had no intention of rummaging around among Coolidge's effects or of dispossessing him of any of his property. Nor can it be said that they should have obtained Coolidge's permission for a seizure they did not intend to make. There was nothing to compel them to announce to the suspect that they intended to question his wife about his movements on the night of the disappearance or about the theft from his employer. Once Mrs. Coolidge had admitted them, the policemen were surely acting normally and properly when they asked her,

as they had asked those questioned earlier in the investigation, including Coolidge himself, about any guns there might be in the house. The question concerning the clothes Coolidge had been wearing on the night of the disappearance was logical and in no way coercive. Indeed, one might doubt the competence of the officers involved had they not asked exactly the questions they did ask."

In a case almost identical on the facts to the instant case, the United States Court of Appeals in Dorman v. United States, 140 App. D. C. 313, 435 F. 2d 385 (1970), sustained the admissibility of clothing found by the police while searching defendant's home without a warrant some 4 hours after the robbery of a clothing store. The court noted that the robbers involved were dangerous, that the most likely place the police would find defendant after 10 p.m. was in his home, and that the purpose of the intrusion was to arrest him. Although entry was obtained by the consent of defendant's mother, there was a time lapse of approximately 2 hours between a determination of defendant's identity and the search of his home. The court in Dorman set down six rules for determining whether there are "exigent circumstances" or "urgent need" to search for a suspect in his home without a warrant: First, that a grave offense is involved, such as a crime of violence; second, that the suspect is believed to be armed; third, that there be a clear showing of probable cause to believe the suspect committed the crime; fourth, strong reason to believe the suspect is on the premises; fifth, a likelihood the suspect will escape if not swiftly apprehended; sixth, that although the entry may not be with consent, it must be peaceable. The court pointed out that in addition to the likelihood the suspect would be in his home, delay involved in securing a warrant might permit his escape, and although the elapsed time of 4 hours did not make this a case of hot pursuit, the police were dealing with a recent crime where a prompt arrest might preserve the instrumentalities and fruits of the crime. The facts in the case disclose no rum-

maging of drawers, and the evidence discovered was in an area where the suspect might well have been hiding. In sustaining the validity of the warrantless seizure, the court made this cogent observation (140 App. D. C. 322, 435 F. 2d 394):

"* * * The courts have respect for the intelligent law enforcement activities of the police, situated as they are in the front line of the campaign for law and order, and this case plainly depicts police officers engaged steadily and systematically in the identification and pursuit of the criminal suspects."

We are in accord with the views thus expressed. In the instant case a helpless woman was the victim of a brutal and mindless murder. By prompt and effective investigation, the police were able to find a clue of critical importance which led them to the defendant's home. Although his wife objected to their entering the home, it was, nonetheless, done without force or violence, notwithstanding the fact the police would have been justified in overcoming resistance. In our opinion, where only a little more than an hour has elapsed after defendant's identity has been established, the police are justified in going immediately to defendant's home without waiting for a warrant. This is particularly true where the events occur in the middle of the night, and time is of the essence. The police were not only aware of the fact that defendant was armed and dangerous, but also that he had recently been released from prison. He had every motive for fleeing from the jurisdiction. The police would have been derelict had they not interrogated defendant's wife to determine his whereabouts. The obvious and logical place to search for him in the first instance was his own home, and the fact that his car was not there was not conclusive evidence that he was elsewhere. Indeed, as the facts developed, he appeared at the moment the police departed. Under all these circumstances, we hold that it was not unreasonable nor a violation of the Fourth Amendment for the police to enter the apartment, search for defendant, and spend some 45 minutes interviewing defendant's wife. Since

there was no "rummaging" of the kind condemned by the Federal courts, and the evidence seized was in plain sight, we hold that it was admissible and affirm the conviction.

Affirmed.