STATE v. DIANE MARIE CLARK.
STATE v. JIMMIE FRANCIS PAVELKA.

250 N. W. 2d 199.

January 21, 1977—Nos. 46056, 46070.

*O'Connell & Thuet* and *William F. Thuet,* for appellant Clark.
*Collins & Buckley* and *Earl P. Gray,* for appellant Pavelka.
*Warren Spannaus,* Attorney General, *John O. Sonsteng,* County Attorney, and *Thomas F. VanHorn,* Assistant County Attorney, for respondent.

Heard before Sheran, Peterson, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

These are consolidated appeals from judgments of the Dakota County District Court convicting Jimmie F. Pavelka and Diane M. Clark of unlawful possession of controlled substances. On appeal defendants dispute the findings of the district court following a Rasmussen hearing on suppression of evidence. The case centers on the legality of the warrantless arrests of the defendants, pursuant to which evidence leading to their convictions was seized. Appellants seek suppression of seized evidence and ask that their convictions be set aside.

At about 6 p.m. on February 4, 1975, Officer Alan Larsen of the South St. Paul Police Department received by telephone a tip from a reliable informant that narcotics would be purchased that evening from Jimmie Pavelka at his apartment in Inver

Grove Heights. At 6:30 p.m. Larsen received a second call from the informant and was told that Pavelka was out picking up the drugs and would return home later to make the sale.

Larsen set up surveillance of the Pavelka apartment beginning at 8 p.m. Pavelka returned home about 10:30 p.m., entered his apartment, returned to his car and appeared to remove a package from it, and then reentered his apartment. At about 10:50 p.m. two other individuals, Wayne Zamen and Craig Christiansen, also named by the informant, arrived by car at Pavelka's apartment. They left at about 11:30 p.m. and were followed by Larsen in an unmarked squad car. The vehicle driven by Zamen was stopped by a marked squad car assisting Larsen about one mile from the Pavelka apartment and its five occupants were placed under arrest. A pat-down search of Christiansen revealed a syringe containing a small amount of a liquid. A search of the car turned up a small plastic packet believed by Larsen to contain phencyclidine, a Schedule III controlled substance. The occupants of the car were taken to the South St. Paul police station and booked.

Larsen and his fellow officer, Sergeant Curtis Nielson, returned to Pavelka's apartment at about midnight, and were met by three other officers from the Inver Grove Heights Police Department. Larsen obtained a passkey to Pavelka's apartment from the apartment complex manager and proceeded to Pavelka's door with three of the officers. At the Rasmussen hearing, Larsen testified as follows:

"Q. And I believe that you said you knocked on the door?

"A. Yes, Sir.

"Q. How many times did you knock?

"A. At least twice, I believe, three times.

"Q. When you say 'Three times', was it three times in succession or did you wait for awhile and knock again?

"A. No, Sir. There was a pause in between each knock. It wasn't one knock, it was several raps, a pause, several raps again.

"Q. When you say 'Several raps', was this a soft knocking or did you do it fairly loud?

"A. No. It was very loud.

"Q. Did you do it with your fist?

"A. I did.

"Q. And the other Officers were there?

"A. Yes.

"Q. What were you saying while you were knocking on the door?

"A. 'This is the Police Department, would you open up?'

"Q. At that point what was your intent, Officer?

"A. Our intent was to arrest Mr. Pavelka for the possible sale of Controlled Substance.

"Q. How many times, would you say, did you say the Police were outside, open up?

"A. Each time we rapped.

"Q. And were you the one that was doing, you know, doing the talking?

"A. Yes, Sir.

"Q. The other Officers, were they saying anything at that point that you can remember?

"A. I don't believe so.

"Q. How long would you have been standing outside the door? How long did this take, do you think?

"A. Approximately a minute. Just an estimate.

"Q. Did anybody come to the door?

"A. No, Sir.

"Q. Did you hear anything inside?

"A. No.

"Q. Did you hear anybody responding to the knock on the door?

"A. No.

"Q. Could you see anything inside the apartment?

"A. No, Sir.

"Q. What did you do then, Officer?

48

"A. Inserted the passkey and opened the door, walked into the entryway right in front of the door. It was actually part of the living room."

The lights were turned on and Larsen called out Pavelka's name three times. Pavelka walked out of the bedroom, nude and appearing to be groggy from sleep. Larsen placed Pavelka under arrest for sale of a controlled substance. Diane Clark was discovered in the bedroom in bed; she was also placed under arrest. Sometime during the arrest procedure Sergeant Nielson seized a glass jar of suspected marijuana and two plastic packets containing suspected phencyclidine which he observed in "plain view" on the coffee table in the living room. Pavelka and Clark were taken to the South St. Paul police station and booked for unlawful possession of controlled substances and for unlawful possession with intent to sell a controlled substance.

At 5:20 a.m. on February 5, 1975, Larsen obtained a search warrant for Pavelka's apartment, which was executed at 5:30 a.m. Additional illegal drugs were seized pursuant to this search. A search of Diane Clark's purse at the Dakota County jail revealed a quantity of phencyclidine.

At the Rasmussen hearing the court refused to suppress evidence seized at the time of the arrests, and in subsequent searches of Pavelka's apartment and Clark's purse. At trial, Pavelka was found guilty on two counts of unlawful possession of controlled substances; Clark was found guilty on one count of unlawful possession of a controlled substance.

It is obvious that defendant Clark's arrest was unlawful. Without an extensive analysis of criminal and constitutional law, the facts clearly show that the police had no information that she was in any way involved until she was discovered in bed in defendant Pavelka's apartment. Certainly at that time there was a complete absence of probable cause to arrest Clark. She was convicted for the possession of the phencyclidine found in her purse while illegally being held at the Dakota County jail. It is clear that under the "fruits of the poisonous vine" doctrine this

evidence must be excluded. A person cannot be arrested and searched merely because he is found in suspicious circumstances.[1] We therefore reverse defendant Clark's conviction.

Pavelka also raises the issue of the legality of his arrest. He further contests the legality of the search of his apartment at the time of his arrest and of the subsequent search pursuant to the search warrant.

It should first be stated that the legality of both the search incidental to the arrest and the later search pursuant to the warrant necessarily depends in the first instance upon the legality of the arrest itself. The objects seized during the original search clearly satisfy the "plain view" doctrine,[2] and the basis for the search warrant rests upon the items seized during the search incidental to the arrest. From the facts presented, if the arrest was lawful, so were both of these searches. We will therefore examine whether the arrest was valid on either statutory or constitutional grounds. There was no dispute at the Rasmussen hearing as to the reliability of the informant or that there was probable cause sufficient to arrest Pavelka for the sale of narcotics. It should also be noted that Pavelka stipulated to the constructive possession of controlled substances.

Pavelka strenuously questions whether there was proper compliance with Minn. St. 629.34. The relevant parts of § 629.34 provide:

"A peace officer may, without warrant, arrest a person:

\* \* \* \* \*

"(3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it;

\* \* \* \* \*

---

[1] See, State v. Fox, 283 Minn. 176, 168 N. W. 2d 260 (1969); State v. Fish, 280 Minn. 163, 159 N. W. 2d 786 (1968).

[2] See, Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. ed. 2d 564 (1971).

"To make such an arrest, the officer may break open an outer or inner door or window of a dwelling house if, after notice of his office and purpose, he shall be refused admittance."

It is not disputed that entry by means of a passkey constitutes a "breaking" under the statute. The issue thus narrows to whether there was an announcement of purpose and a refusal of admittance. There are several exceptions to the strict requirements of the "knock and announce" rule of § 629.34, developed in Federal cases interpreting 18 USCA, § 3109,[3] which should be discussed in relation to the facts of this case. Two of these exceptions are (1) the "useless gesture" or "senseless ceremony" rule and (2) the "possible destruction of evidence" rule. The United States Supreme Court has stated that the "useless gesture" rule requires that "the facts known to officers would justify them in being virtually certain" that the occupant of the dwelling "already knows their purpose so that an announcement would be a useless gesture." Miller v. United States, 357 U. S. 301, 310, 78 S. Ct. 1190, 1196, 2 L. ed. 2d 1332, 1338 (1958). In Bosley v. United States, 138 App. D. C. 263, 426 F. 2d 1257 (1970), the United States Court of Appeals for the District of Columbia Circuit permitted an unannounced, non-forcible entry through an open door after officers had observed the defendant sleeping within and were unable to wake him by knocking. The court found that "[s]ince appellant had not been awakened by their knocking, the officers could reasonably have concluded that further knocking or verbal announcement would be a 'useless gesture.'" We certainly agree, under the present factual setting, that any further statement by the police would have been a "useless gesture" or a "senseless ceremony."

From the peace officers' point of view, it would seem naive

---

[3] 18 USCA, § 3109 provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

to suggest that Pavelka, who had undoubtedly been dealing in drugs for some time and had just concluded several sales, would not know why the police, upon announcing who they were, were pounding loudly on his door. This relatively recent and expanding phenomenon of opening up one's residence as a place for illegal commercial drug trade,[4] where it would be expected that possibly dangerous drug users and addicts would frequent it and where the "pusher" himself is often dangerous, surely requires law enforcement officers to move rapidly and with great care in anticipation of danger in performing their necessary duties.[5] Further, it is well-known to law enforcement authorities that drugs can rapidly be destroyed by simply flushing them down a toilet or by other means. Thus, it is incumbent upon the police, having established probable cause, to arrest the perpetrator of such sales and confiscate the remainder of the drugs, in order to be able to establish at trial the fact that this was the defendant who had possessed and sold the drugs.

To suggest that an arrest warrant should have been obtained in such a situation is unrealistic and would, at the least, revolutionize law enforcement procedures. The present nationwide procedure for obtaining a warrant, almost without exception, is to present evidence to the prosecuting attorney for his careful study and conclusions as to which penal statutes have been violated. The entire situation here developed rapidly between 6 p.m. and midnight. Every item reported by the reliable informant was verified. There were arrests of the actual buyers. At the time of Pavelka's arrest he still had possession of the drugs from the package that he had been seen carrying into his apartment. This evidence had to be secured rapidly. The police had ample probable cause and no possibility of obtaining a warrant through the prosecutor's office until morning, at which time it is constitutionally required that the facts constituting probable cause

---

[4] See, Lewis v. United States, 385 U. S. 206, 87 S. Ct. 424, 17 L. ed. 2d 312 (1966).

[5] See, State v. Bitterman, 304 Minn. 481, 232 N. W. 2d 91 (1975).

be presented under oath and affirmation to a detached magistrate for his consideration. Under the facts and the good police practices exercised in this case, to hold that the police did something so statutorily or constitutionally unreasonable that the evidence should be excluded would be unrealistic and of no future instructive value in our difficult and questionable role in policing the police.

Pavelka further claims that in the absence of exigent circumstances peace officers may not effect a valid arrest by warrantless entry into a dwelling place. In United States v. Watson, 423 U. S. 411, 96 S. Ct. 820, 46 L. ed. 2d 598 (1976), Mr. Justice Stewart, in his concurring opinion, seems to express the general conclusion of the case in this area by stating:

"The Court does *not* decide, nor could it decide in this case, whether or under what circumstances an officer must obtain a warrant before he may lawfully enter a private place to effect an arrest. See *Gerstein v. Pugh,* 420 U. S. 103, 113 n. 13, 95 S. Ct. 854, 863, 43 L. ed. 2d 54; *Coolidge v. New Hampshire,* 403 U. S. 443, 474-481, 91 S. Ct. 2022, 2042-2046, 29 L. ed. 2d 564; *Davis v. Mississippi,* 394 U. S. 721, 728, 89 S. Ct. 1394, 1398, 22 L. ed. 2d 656; *Jones v. United States,* 357 U. S. 493, 499-500, 78 S. Ct. 1253, 1257-1258, 2 L. ed. 2d 1514."

Pavelka's claims seem speculative to say the least, but assuming that exigent circumstances are required, it is a well-known fact in narcotics cases that drugs are often easily destroyed, therefore, that possibility along with all the other circumstances of this case would appear to provide the required exigent circumstances. Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. ed. 2d 726 (1963).

We therefore conclude that this factual setting discloses that both the statutory and constitutional standards have been complied with, and the conviction of Pavelka is therefore affirmed.

Reversed as to the conviction of Clark; affirmed as to the conviction of Pavelka.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.