**STATE of Minnesota, Respondent,**

v.

**Dale Martin LOHNES, Appellant.**

**No. C3–82–1650.**

Supreme Court of Minnesota.

Feb. 3, 1984.

C. Paul Jones, Minnesota State Public Defender, Minneapolis, Brian Wojtalewicz, Appleton, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., St. Paul, John Riches, II, Swift County Atty., Benson, for respondent.

KELLEY, Justice.

Appellant, Dale Martin Lohnes, was charged with the July 12, 1982 murder of DeAnne Dahl in Murdock, Minnesota. A jury found him guilty of murder in the second degree under Minn.Stat. § 609.19, subd. 2 (1982). On appeal he seeks reversal of his conviction and alleges that his arrest by officers at nighttime in his place of abode without a warrant violated his constitutional rights and that evidence obtained by investigating officers thereafter should have been suppressed at his trial. We conclude exigent circumstances justified the entry into his abode and his subsequent arrest. We further conclude that the seizure of clothing which had been washed and of blood stains from a laundry tub were constitutionally permissible. Accordingly, we affirm.

Before addressing the legal issues, it is necessary to state the facts in some detail. On July 12, 1982, 22-year-old DeAnne Dahl died from loss of blood due to a 1⅜ inch laceration of her throat. Occupants of an apartment above the Murdock Post Office were awakened at approximately 3:50 a.m. by a pounding on their door. Upon answering the knock, they discovered Ms. Dahl lying in the hall covered with blood.

Her pants were unzipped and part way down. The rescue squad was called immediately but Ms. Dahl died about an hour later.

At 4:04 a.m. Swift County Sheriff Kenneth Hanson received a call informing him that a young woman had been discovered with her throat slashed in the Peterson Apartments in Murdock.[1] Sheriff Hanson immediately drove to Murdock from his house 15 miles away and arrived at the apartments at 4:26 a.m. He was met there by one of his deputies, Larry Hindberg, who had arrived at the scene minutes earlier. Deputy Hindberg directed the sheriff into the apartment where the assault had taken place. Upon entering, the sheriff observed blood spattered on the walls and floor throughout the living room and on a chair close to the door. He further observed bloody hand prints on the floor leading to a room in the apartment where, Deputy Hindberg had informed him, an individual was sleeping. Upon entering this room, he observed a male lying in a blood-soaked bed. This person was Mark Peterson.

Before awakening Peterson the sheriff went to his squad car to get a camera. While outside, two firefighters from the fire hall across the street[2] informed him they had seen an older green Pontiac leaving the apartment parking lot at approximately 4:20 a.m. They had observed two individuals in this car and recorded the South Dakota license plate number BHT 129. The sheriff immediately radioed a bulletin to police authorities to stop the car.

After returning to the apartment and taking several pictures of the still-sleeping Peterson, Sheriff Hanson succeeded in awakening Peterson with some difficulty. When aroused, Peterson looked and acted confused and muttered, "good job, good job." When Peterson was finally aroused and sat upon the bed, the officers noted there was no blood under his body where he had been lying on the bed. During questioning, Peterson informed the officers that he was the superintendent of a crew that had been constructing an elevator in Murdock. On July 11, 1982, the crew had completed one phase of the construction which consisted of continuous pouring of concrete and had worked many continuous hours without rest. Upon completion of that phase of construction, the company threw a party for the crew which started at the job site and later moved to the Peterson Apartments parking lot and a nearby park. Many of the persons attending the party had consumed a large amount of intoxicants. Some local women had joined the party, including Ms. Dahl. Peterson also informed the officers that his brother-in-law, David Houska, was sleeping in another room of the apartment. The officers then awakened Houska.

From talking with Peterson and Houska, Sheriff Hanson learned that Peterson and Ms. Dahl had been in the apartment about midnight when defendant Lohnes walked into the apartment, sat down on a chair in the living room, and fell asleep. Ms. Dahl and Peterson then returned to the parking lot. Around 1:30 a.m. Peterson returned to the apartment and went to sleep in his room. Defendant was then still asleep in the chair. At 2 a.m. Houska and Ms. Dahl came to the apartment. Ms. Dahl sat down in another chair in the living room and fell asleep while Houska made something to eat. Before going to bed about 2:30 a.m., Houska unsuccessfully attempted to arouse Ms. Dahl. Thus, when he retired both defendant Lohnes and the victim, DeAnne Dahl, were asleep in separate chairs in the living room of the apartment. Thereafter, neither Peterson nor Houska heard or saw anything until they were awakened by the officers.

1. There are three apartments above the Murdock Post Office known as the Peterson Apartments. The individuals who discovered Ms. Dahl lived in one apartment across the hall from the apartment where the crime occurred.

2. In Murdock, when the call went to the rescue squad, fire phones rang in the homes of members of the volunteer fire department. Some of them responded by coming to the fire hall.

In answer to an inquiry by the sheriff whether either was familiar with an older green Pontiac, Peterson stated it belonged to Larry Lovejoy, one of the construction crew members. The sheriff, Peterson and Houska went to the office at the construction job site to find a local address for Lovejoy. While there, Houska informed the sheriff that Lohnes had been driving the Pontiac earlier the previous evening and inquired whether the officers had checked at the Diederich house where defendant was staying to see if the vehicle was there. Upon receiving this information, Peterson directed Sheriff Hanson to the Diederich house where they observed a green Pontiac with South Dakota license plate *BHT 139* (emphasis added) parked at the curb. By this time it was approximately 5:05 a.m.

Deputy Hindberg joined the group at the Diederich house. Peterson, who had previously lived in the basement of the Diederich house and was familiar with the layout of the house, led the officers around to the back and through the outside entrance door into a garage. Peterson then opened an unlocked door into the house, following which Peterson and the officers walked down the steps into the basement. At the bottom of the stairs they entered the basement through an open-framed door. Peterson turned on the light and identified three men sleeping in the room. One of those was defendant Lohnes. He was the only one in the room sleeping under covers. Another individual was asleep in a second room in the basement. When Sheriff Hanson pulled the covers back to awaken Lohnes, he observed defendant sleeping in the nude. Hanson also noticed clothes lying next to the bed. When he reached down to hand them to the defendant, the sheriff noticed the clothes (shirt, pants and shorts) were wet. He also observed a wet towel lying on the floor next to Lohnes' bed. Sheriff Hanson thought it strange that defendant appeared to be the only

individual in the room "cleaned up" and sleeping under covers.[3]

After getting out of bed, defendant dressed in other clothes. By this time the other three men in the basement apartment were awake. Sheriff Hanson asked Peterson, Houska, defendant and Kohl, another occupant of the basement, to come with the officers for questioning. The other occupants were directed to leave the basement apartment but to stay close by because the police would be questioning them. Having learned that Kohl had been in a fight at the party with Rick Palmersheim, another member of the construction crew, and that Palmersheim's bloody shirt had been found by the rescue volunteers, the sheriff took Peterson, Houska and Kohl with him to Benson, a town about 14 miles away, where he believed Palmersheim was staying that night.

Meanwhile, a makeshift police station was established in the Murdock firehall across the street from the Peterson Apartments. Deputy Hindberg, taking defendant Lohnes with him, drove back to the Peterson Apartments around 6 a.m. The deputy parked and locked his squad car, leaving the defendant inside. Shortly thereafter, Sheriff Hanson returned to the Peterson Apartments from Benson and met Deputy Hindberg and Thomas Erson, Minnesota Bureau of Criminal Apprehension agent, who had by this time arrived at the scene. Erson and Hanson questioned Houska, Peterson, Kohl and Palmersheim between 7 and 9:30 a.m. While they were being questioned, defendant Lohnes, apparently asleep, remained in Deputy Hindberg's squad car on the street.

At about 9:30 a.m. at Sheriff Hanson's request, Hindberg removed Lohnes from the car, handcuffed him and brought him to the firehall for questioning.[4] When defendant Lohnes arrived in the firehall, the cuffs were removed, he was furnished a cup of coffee, and permitted to use rest-

---

3. At the trial, Lovejoy testified he was also undressed and sleeping under covers that morning.

4. At the trial defendant contended that he had been handcuffed at all times after being removed from his bedroom.

room facilities. Thereafter he was given the *Miranda* warnings. He was then briefly questioned by Hanson and Erson. After again giving Lohnes the *Miranda* warnings, his interrogation was taped. In the taped statement the defendant told the officers that he had gotten blood on his shirt and pants when he had attempted to break up the fight between Palmersheim and Kohl. He admitted to having a conversation with DeAnne Dahl the night before. He claimed that when he awoke in the living room of the apartment Ms. Dahl was still asleep in another chair. He claimed he left the apartment and walked down the alley to his residence. There, he claimed, he had a short talk with Lovejoy and headed back to the parking lot to find Kohl. On his way out of the house he met Diederich, the owner, who was a member of the volunteer fire department. Lohnes returned to the parking lot and drove Kohl back to the Diederich house in the green Pontiac. Once in the Diederich house he washed the blood, which he claimed was from the Palmersheim/Kohl fight, from his clothes and went to bed.

Following this interrogation, the defendant was told to stay around town because the sheriff wished to interview him again, but he was at that time released from custody. Later, during the afternoon, defendant and three other construction crew members were taken to Benson where samples of blood, saliva and pubic hair were taken from each. At about 7 p.m. defendant Lohnes was again questioned by the officers. After this interrogation he was allowed to return to his apartment. The following morning Lohnes called the sheriff seeking permission to go home to South Dakota but was told to remain in Murdock. A third interrogation took place the night of July 13. Following that, Lohnes was told that he was free to go to South Dakota and, in fact, the sheriff gave him a ride almost to the state border.

Meanwhile, during the afternoon of July 12, the sheriff and Minnesota crime bureau agents made a warranted search of the defendant's apartment and the Pontiac for a weapon and for the damp clothing the sheriff had noted earlier in the morning. At that time they seized the clothing. Later, on July 15, two other searches were made pursuant to search warrants for a weapon and blood stains. No weapon was found, but blood stains from a laundry tub were seized by the investigating officers.

By July 19 the investigating officers had received a Bureau of Criminal Apprehension crime report that indicated blood found on the defendant's pants, which had been seized in the first warranted search, was consistent with the victim's blood and inconsistent with defendant's blood or with the blood of the two fighters, Palmersheim and Kohl.[5] On that day defendant returned to Murdock. He was met by Sheriff Hanson, taken to the firehall, again given his *Miranda* warnings, and interrogated by the sheriff and three Bureau of Criminal Apprehension agents. He was confronted with the result of the blood test. During this interrogation he admitted drinking a large amount of alcohol and smoking marijuana in the course of the party on the night and early morning of July 11–12. This interrogation was terminated when defendant asked for an attorney. He was then placed under formal arrest.

At the omnibus hearing the trial court ruled that in the early morning hours of July 12 Sheriff Hanson had probable cause to believe someone staying in the Diederich basement apartment had committed a felony and that, therefore, the entry without a warrant was justified by exigent circumstances. Having held that the arrest was legal, the trial court ruled the statement given by defendant on July 12, the clothing seized pursuant to a subsequent warrant, and the blood stains later lifted from the laundry tub pursuant to a search warrant

**5.** The Minnesota Bureau of Criminal Apprehension identified blood stains on defendant's blue jeans as coming from the victim. Only 1.7% of the total population has the same blood-enzyme type. The blood found was not consistent with that of either Kohl or Palmersheim. This evidence was admitted for the jury's consideration.

were admissible and not the result of an illegal arrest. At the omnibus hearing in the trial court, and here, defendant claimed that Sheriff Hanson's warrantless entry into the room which was defendant's abode violated his rights under both the United States and Minnesota Constitutions to be secure in his person, house, papers and effects against unreasonable search and seizure. U.S. Const. amend. IV; Minn. Const. art. I § 10.

Because defendant's statement to the investigating officers and the subsequent searches of his apartment flowed directly from the initial intrusion, defendant asserts the statement and the results of the searches should be suppressed. The state contends, and the trial court so held, that the initial arrest was justified by exigent circumstances. All of the other issues raised by defendant on this appeal hinge upon the legality of the entry into defendant's place of abode.

■■■ The state contends that defendant Lohnes was not arrested in his apartment during the early morning hours of July 12 but was merely placed under "custodial detention." We reject that contention and agree with the omnibus hearing court that the defendant was then arrested. An arrest takes place when officers restrain a suspect's liberty of movement. *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *State v. Harris*, 265 Minn. 260, 269, 121 N.W.2d 327, 333–34 (1963). When a suspect is ordered into a police squad car so constructed that he cannot get out from the inside, left there for 3 to 4 hours, handcuffed at least during the period of his removal from the car to the police station, accompanied in all his movements by police officials, and not free at any time to leave, this amounts to an arrest. It is a complete and full intrusion on his liberty, regardless of whether the suspect was formally placed under arrest. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). Therefore, unless Sheriff Hanson's warrantless entry into the place of abode of defendant Lohnes and the subse-

quent arrest comes under an exception to the constitutionally mandated requirement of a warrant, both the entry and the arrest were illegal and this case must be reversed.

■■ We turn, then, to examine the legality of the entry and arrest. The requirement of a warrant duly issued by a magistrate upon probable cause embodied in United States Constitution Amendment IV and Minnesota Constitution Article I, Section 10 reflects the principle of English Common Law that a person's home is his or her castle, and no state authority may intrude therein without first having convinced an impartial magistrate that probable cause exists that the person has committed a crime and that other reasons exist justifying the intrusion. The fourth amendment has drawn a firm line at the entrance to a person's abode. A search or a seizure of a person or his property carried out on premises occupied by a suspect as his abode without a warrant is per se unreasonable. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). However, the Supreme Court of the United States has recognized an exception to the warrant requirement by upholding warrantless searches and seizures of a suspect in his home when exigent circumstances exist. The Supreme Court to date has not specifically defined "exigent circumstances." It has, however, acknowledged the presence of exigency in cases of "hot pursuit," *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); danger to human life, *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); imminent destruction of evanescent evidence, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); and possible flight of a suspect, *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

One federal court has attempted to define "exigent circumstances" by enumerating six factors which must be met before exigency justifies a warrantless entry. *Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970). In *State v. Lasley*, 306

Minn. 224, 236 N.W.2d 604 (1975), *cert. denied* 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977), we generally expressed accord with the view of the *Dorman* court's listing of the following six factors:

First, that a grave offense is involved, such as a crime of violence; second, that the suspect is believed to be armed; third, that there be a clear showing of probable cause to believe the suspect committed the crime; fourth, strong reason to believe the suspect is on the premises; fifth, a likelihood the suspect will escape if not swiftly apprehended; sixth, that although the entry may not be with consent, it must be peaceable.

*Lasley*, 306 Minn. at 232, 236 N.W.2d at 609. However, the *Dorman* analysis has been frequently criticized for its inflexibility and ambiguity. For example, it is unclear as to how each factor should be weighed or whether all factors must be met. Donnino & Girese, *Exigent Circumstances for a Warrantless Home Arrest*, 45 Albany L.Rev. 90, 106 (1980). It has likewise been criticized for offering no practical guidance to an officer on the street, Larkin, *Exigent Circumstances for Warrantless Home Arrests*, 23 Ariz.L.Rev. 1171, 1174 (1981), and for being so sophisticated as to lead to an overly cautious attitude on the part of the police. 2 W. La-Fave, Search and Seizure § 6.1, at 390 (1978). For these reasons, some courts have used the *Dorman* analysis as a "guideline, rather than an absolute test for the presence of exigent circumstances, because such a determination ultimately depends on the unique facts of each controversy." *United States v. Jones*, 635 F.2d 1357, 1361 (8th Cir.1980); *see also United States v. Adams*, 621 F.2d 41 (1st Cir.1980).

Even the District of Columbia Circuit Court, subsequent to the *Dorman* decision, acknowledged that the *Dorman* analysis allows for flexibility and, in essence, adopted a "totality of circumstances" test. *United States v. Lindsay*, 506 F.2d 166, 172 (D.C.Cir.1974). The California court

first adopted the "totality of circumstances" approach. *People v. Ramey*, 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333 (1976), *cert. denied*, 429 U.S. 929, 97 S.Ct. 335, 50 L.Ed.2d 299 (1976). Using this analysis, a court focuses on all facts and a compelling need for immediate police action and does not lose sight of the total picture by considering only six sometimes irrelevant factors, keeping in mind probable cause must always exist. This approach is in accord with the United States Supreme Court's discussion of "totality of circumstances" analysis in the context of probable cause to issue a search warrant. *Illinois v. Gates*, —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). There, the Court discouraged "technical dissection" and "undue attention * * * on isolated issues." *Gates*, 103 S.Ct. at 2330. It recognized, for example, that probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 103 S.Ct. at 2328.

■ While in *Lasley* this court did agree with the *Dorman* court's general analysis of exigent circumstances, we did not expressly adopt the test.[6] A careful reading of *Lasley* indicates, rather, that in determining whether exigent circumstances exist we should, in effect, consider the totality of the circumstances surrounding the entry and the seizure. In so doing consideration of some or all of the factors set forth in *Dorman* may be helpful as guidelines to determine whether exigent circumstances do exist. However, those factors are not to be rigidly applied. Rather, our inquiry should be addressed to a consideration of all the circumstances. Indeed, we did so in *Lasley*, 306 Minn. at 232–33, 236 N.W.2d at 609.

■ In the instant case, all of the actions of Sheriff Hanson and Deputy Hindberg with respect to attempting to locate the perpetrator of the crime took place in a time span of approximately 35 minutes. At the time of the entry, the sheriff knew that a grave offense, a crime of violence had occurred. He had reason to believe the

---

**6.** In Note, *Warrantless Arrests: Justification by Exigent Circumstances*, 6 Hamline L.Rev. 191 (1983), the author contended we had adopted a "version" of the *Dorman* test.

perpetrator might be armed because no weapon had been found.[7] It was likely the suspect was on the Dierderich premises because he had last been seen alive with the victim and had, a few hours earlier, been driving the Pontiac now parked outside the premises but seen leaving the Peterson Apartments shortly after the crime had been discovered. He had been informed that crew members staying in the Diederich basement were itinerant workers, mostly from out of state. There existed a likelihood the suspect might flee if not swiftly apprehended. Finally, the entry was peaceable. Thus, all but one of the *Dorman* "guidelines" for an entry based on exigent circumstances have been clearly satisfied.

But was there a clear showing that the sheriff had probable cause to believe defendant Lohnes had committed the assault? A minimal showing of probable cause or a "mere suspicion" is clearly insufficient. *United States v. Williams,* 604 F.2d 1102, 1122 (8th Cir.1979). We stated in *State v. Hatcher,* 322 N.W.2d 210, 217 (Minn.1982), that "probable cause to believe that [a suspect] had committed the crime" is sufficient. In *State v. Sorenson,* 270 Minn. 186, 196, 134 N.W.2d 115, 123 (1965), we stated: "The question to be answered is whether an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested." In our view the totality of the circumstances then existing make a clear showing that Sheriff Hanson had probable cause to believe Lohnes was the wanted suspect. Lohnes was the last person seen with the victim when she was still alive in the living room of the Peterson Apartments approximately 1½ hours before the assault. Facts known to the sheriff included that Ms. Dahl had been assaulted in that room. At the time of the discovery of the victim, Lohnes had left the

apartment. Shortly after the discovery of the victim, a green Pontiac bearing South Dakota license plates had been seen departing from the Peterson Apartments parking lot. Lohnes had been driving the vehicle the night before. It was found parked outside the premises where Lohnes resided. From these facts we conclude that Sheriff Hanson reasonably could have believed the crime was committed by the defendant. Thus, all the "guidelines" of the *Dorman* test have been met.

Going beyond those "guidelines," however, there were other circumstances creating the exigency justifying the entry. It was early in the morning, approximately 5 a.m. The nearest magistrate was 15 miles away. It would have been difficult, if not dangerous, to attempt a stake-out of the house without a sufficient force of trained officers, especially since the weapon had not been found. The additional facts that the suspect was from out of state, that the state border was close, and that the suspect had a "motive for fleeing" *State v. Lasley,* 306 Minn. 224, 233, 236 N.W.2d 604, 610 (1975), add to the existence of exigent circumstances calling for prompt action.

■ Although the entry to defendant's abode was peaceable, the sheriff neither knocked nor announced his purpose before entering either the Diederich house or its basement. Minn.Stat. § 629.34 (1982). He was led into the house and down the basement area by Peterson. Under the circumstances then existing, knocking and announcing his purpose not only might have been but undoubtedly would have been a useless gesture. The occupants of the basement had worked long hours after which they attended an extended party. The evidence is clear that the officers had difficulty in awakening each member of the crew, both at the Peterson Apartments and at the Diederich house. If it would have been a useless gesture, as most certainly it

---

**7.** The desirability of quickly removing a danger to the police and public posed by an armed suspect has been viewed as an exigent circumstance. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *State v. Hatcher,* 322 N.W.2d 210 (Minn.1982). In the house, in addition to the coworkers, were members of the Diederich family.

would have been here, failure to knock and announce will not invalidate the entry. *State v. Clark*, 312 Minn. 44, 250 N.W.2d 199 (1977).

Accordingly, we affirm the trial judge's ruling that exigent circumstances existed justifying a warrantless entry and arrest. Defendant's damp clothing and the bloodstains from the laundry tub were spotted inadvertently by Sheriff Hanson during his lawful presence in defendant's abode and thus were lawfully admitted under the "plain view" doctrine. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The statement given by defendant on July 12 was likewise properly admitted into evidence. He was twice given the *Miranda* warning, after which he voluntarily answered questions posed by the investigating officers.

We affirm the conviction.