STATE of Minnesota, Respondent,

v.

George HATCHER, Appellant.

No. 46830, 81–815.

Supreme Court of Minnesota.

July 23, 1982.

Rehearing Denied Aug. 31, 1982.

Doyle, Henschel & Erickson, Friedberg & Peterson and Mark W. Peterson, William J. Mauzy and Leah Fujimoto, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Asst. County Atty., Thomas A. Weist and Richard Osborne, Asst. County Attys., Beverly J. Wolfe, Staff Atty., Minneapolis, for respondent.

SCOTT, Justice.

This is the combined appeal of George Hatcher's conviction for first degree murder and a denial of post-conviction relief.

Fifteen-year-old David Reitsma, Jr., was employed at the Clark Station at 3201 Douglas Drive in Crystal, Minnesota. Between 7:00 and 8:00 on the evening of Saturday, October 18, 1975, George Hatcher, the appellant in this case, and Dennis Neumann stopped at the Clark Station where David Reitsma was working. Appellant bought gas and cigarettes at the station and learned from the attendant that the station closed at 11:00 p. m. Appellant and

Neumann then left the Clark Station and went to Adolph's Bar in Robbinsdale. Appellant and Neumann returned to Crystal at approximately 10:30 that evening to rob the Clark Station.

Appellant pulled his car along the front of the Clark Station and rolled down his window. Reitsma came out of the station and asked appellant if he could help him. Neumann pointed a gun at Reitsma through the open window and ordered Reitsma to get in the car. Appellant and Neumann then drove west toward County Road 9.

In the car, Reitsma was instructed by appellant and Neumann to lie face down in the back seat with his head toward the passenger side of the car. While appellant was driving to an isolated location, Reitsma began to cry for a short time and asked appellant and Neumann what they were going to do. Both appellant and Neumann told him three or four times that they were not going to kill him. During the drive, appellant and Neumann had Reitsma give them his money, wallet, keys, coin changer and knife.

While appellant was driving north on Zachary Lane he threw Reitsma's wallet out the window. About a block after appellant threw the wallet out of the car, he noticed flashing red lights a mile ahead. Appellant turned his car around and stopped at the spot where he had thrown Reitsma's wallet; he wanted to better hide the wallet but was unable to find it.

Appellant later described to investigators what occurred next. His statement was admitted and read at trial by Detective Archie W. Sonenstahl of the Hennepin County Sheriff's Office.

Q. [by Detective Sonenstahl] What happened next?

A. [by Appellant] I continued on Zachary Lane to County Road 9 where I went west to I vaguely remembered the name of the street and when I saw it in the paper later I recalled that it was Peony Lane. I went right on Peony Lane about a mile where I stopped the car by a woods on my left down at the bottom of the hill.

Q. What was on your right when you stopped the car?

A. Open field but it was very dark.

Q. Why did you stop the car?

A. To kill the attendant.

Q. Why did you feel that the attendant had to be killed?

A. He knew what we looked like.

Q. What happened after you stopped the car?

A. I got out and tied his hands behind his back.

\* \* \* \* \* \*

Q. What happened next?

A. I drove the car a little further down the road and turned around while Denny took the guy in the woods. While turning the car around I heard gun shots.

Q. How many gun shots?

A. Eight or nine, they were very fast.

Q. Did you know what was happening at the time?

A. I had a good idea, yes.

Q. What was that idea?

A. That the attendant was being shot.

Q. After the attendant was out of the car and when you left to turn the car around, did you know that the attendant was to be shot?

A. Yes.

Q. How did you know this?

A. Denny and I had decided that he was to be shot because he had seen our faces and would be able to identify us.

\* \* \* \* \* \*

Q. When Denny got back into the car, did he have a gun in his hands?

A. He had the gun. I don't remember if he had it in his hand or if he had stuck it in his pants or what.

Q. What kind of a gun was it?

A. A .22 caliber, 9-shot revolver, with long barrel.

Q. Whose gun was it?

A. Mine.

Q. How long had you had the gun?

A. Two to three weeks.

\* \* \* \* \* \*

Q. What happened when Denny got back into the car?

A. He said something about how many times he shot him in the head and how many times he shot him in the back. I don't remember the exact numbers and he said, "He's deader than hell," and then said something about let's get the hell out of here.

At trial appellant recanted his earlier statement and testified that he did not expect Reitsma to be shot, but instead believed he would be left tied-up in the woods.

After Reitsma was killed, appellant and Neumann drove to Diamond Lake Lanes bowling alley in Brooklyn Park. Along the way, Neumann threw Reitsma's coin changer and knife out of the car. Appellant and Neumann drank and bowled at the bowling alley until approximately 1:00 a. m. on October 19. Afterward, appellant was dropped off at the Sheraton Inn on Highway 52 at I–94 by Neumann. Neumann then drove to Clearwater, Minnesota, in appellant's car to pick up appellant's girlfriend, Julie Campion, and another woman named Laurie Ferreal. In Clearwater, appellant's car broke down in front of the Windjammer Inn, so Neumann abandoned it. Neumann and the two women caught a ride back to the Sheraton Inn, arriving at about 3:40 in the morning of October 19. When Neumann and the two women returned, appellant became angry at Neumann when he learned that Neumann had told the two women about the robbery and murder. Later that day appellant and Neumann met appellant's roommate, Richard Working, and one Kevin Hafer in front of a bar. They told Working and Hafer that they had committed a robbery and shot someone.

A phone call received by the Crystal Police Department between 10:40 and 11:00 on the night of the shooting initiated the investigation of the homicide. The Crystal Police received a telephone call from a customer at the Clark Station where Reitsma worked, informing the police that the station was open and unattended. The following Saturday afternoon, October 25, 1975,

Reitsma's body was discovered in the woods along Peony Lane in Plymouth, Minnesota with the hands tied behind the back. The next day, officers investigating the murder scene found an expended .22 caliber cartridge case approximately a foot and a half northeast of where Reitsma's head had been lying on the ground.

An autopsy conducted later that same day revealed the cause of Reitsma's death to have been six gunshot wounds, two in the head and four in the back. Examination by the Bureau of Criminal Apprehension laboratory of the bullets taken from the body and the expended cartridge found near it showed that they were .22 caliber long rifle bullets.

Early in the afternoon of October 28, 1975, Faye Madigan contacted Sergeant Dearel DePew of the Crystal Police Department and relayed information to him concerning the Clark Station robbery on October 18, 1975, and David Reitsma's murder. Madigan identified Harold Olson, a neighbor in her apartment building, as the source of her information. Sergeant DePew approached Harold Olson that afternoon and questioned him. Harold Olson told Sergeant DePew that the appellant was a friend of his and that he had seen appellant during the late evening hours of October 18 or the early morning hours of October 19 at the Diamond Lake Lanes bowling alley. Appellant at that time informed Olson that he and Dennis Neumann had robbed a gas station that evening, taken the station attendant to a wooded area, and that someone had been shot. Appellant also told Olson that Olson's .22 caliber Harrington and Richardson revolver, which appellant had borrowed from Olson a month earlier, had been used in the robbery. According to Olson, appellant and Neumann stayed at the Sheraton Inn on the night of the shooting. Both Olson and Madigan informed Sergeant DePew that appellant's car had been left in front of the Windjammer, a motel in the Clearwater area, sometime during the week of October 20, and that the car had been towed to an unknown location. Appellant reportedly was concerned about

the towing of the car because he believed the weapon used in the robbery and murder was in the vehicle's glove compartment.

After Sergeant DePew concluded his questioning of Olson, he determined through the Sheraton Inn that appellant had been registered there on October 18, 1975, and he obtained appellant's automobile license number, MH–1811, from the hotel registration. A registration check was made on the license number and the vehicle was found to be listed to Christiansen Chevrolet on Highway 5 in Buffalo, Minnesota.

Sometime after 2:00 that Tuesday afternoon, a dozen or more officers from the Crystal and Plymouth Police Departments and the Hennepin County Sheriff's Office met at the Crystal Police Department to discuss the investigation of David Reitsma's murder. During this meeting the officers reviewed all of the information then available concerning the murder, including the information Sergeant DePew had learned earlier that afternoon.

After the meeting ended, at approximately 5:15 p. m., Detective Archie Sonenstahl of the Hennepin County Sheriff's Office called Clifford Christiansen, the owner of Christiansen Chevrolet. Christiansen informed the detective that he had sold a car with license registration MH–1811 to appellant in August of that year, but that because appellant had failed to make his car payments to a local bank Christiansen had repossessed the car. James LaFave, an employee at Christiansen Chevrolet, had picked the car up in front of the Windjammer on October 25 and towed it to the dealership. The car was still at the dealership when Detective Sonenstahl called.

Shortly after 5:30 on October 28, Detective Sonenstahl and other officers obtained a search warrant for appellant's car and proceeded to Christiansen Chevrolet to execute the warrant. James LaFave had cleaned the car out, and produced a number of items for the officers that he had obtained from the vehicle. LaFave found rope similar to the rope used to tie Reitsma's hands and several keys. The numbers on two of the keys corresponded to the key numbers at the Clark Station. A .22 shell and expended casing were also found in the car. However, no gun was found anywhere in the car.

Between 9:00 and midnight that evening, the investigating officers had another meeting at the Crystal Police Department. Shortly afterward the investigating officers learned from the Wright County Sheriff's Office that appellant had a farmhouse in the Annandale area. At some time after 9:00 that evening two officers began a general surveillance, from a distance, of appellant's farm.

At about midnight on October 28, the investigating officers at the Crystal Police Department learned that appellant had been seen that evening drinking in Annandale. The officers also learned at that time that a car had arrived at appellant's farm, dropped off two persons, and then left.

Upon receiving this information, approximately fourteen officers proceeded to appellant's farm. The officers had a short meeting at the Windjammer Inn in Clearwater at about 12:30 a. m. on October 29 and they also had a brief rendezvous at a cement factory near appellant's farm shortly before 1:00 a. m. The officers decided that because the area around the house was too open, they would not attempt to approach the house surreptitiously. Instead, the officers drove directly up the driveway with their vehicles' headlights on. Appellant, who had been watching television, noticed the headlights from the officers' vehicles flash through his livingroom window.

Several officers, including uniformed deputies from Wright County, went to appellant's front door, while several officers covered the rear of the house. The officers were armed and at least some of the officers had their weapons drawn because they believed there was a high probability appellant would be armed also. At the postconviction hearing, Detective Gautsch testified that he was aware before the arrest that a handgun had been used in the murder, that the weapon had not yet been discovered, and believed, therefore, that appellant might be armed.

One of the uniformed officers knocked on appellant's front door, which had a window in it. Appellant opened the door and the officers proceeded into the house. Detective Charles Nygard of the Crystal Police Department asked appellant to identify himself. Appellant said he was George Hatcher, and Detective Nygard placed him under arrest.

After appellant was handcuffed, Detective Sonenstahl informed him that he was under arrest for probable cause homicide. Detective Sonenstahl then read the *Miranda* warning to appellant. In response to Detective Sonenstahl's initial questioning, appellant stated that he understood his rights and was willing to talk to the police; he further said he wanted to know what was going on. Appellant testified that he did not agree to talk to the police. Because the living room was crowded, appellant was then escorted into a bathroom in the house by Detective Sonenstahl, Chief Calvin Hawkinson and Detective David Simondet. The other officers secured the rest of the farmhouse, and the other individual in the house was taken into custody. The officers initially believed that this second person might be Dennis Neumann, but the individual identified himself to the officers as Richard Working, appellant's roommate. While appellant was questioned in the bathroom, he told the officers that he had been with Dennis Neumann all day on October 18, and had not been in Crystal at all on that date.

Appellant was then placed in the custody of Detective Gautsch and Detective Nygard and taken to the Wright County Sheriff's Office. Detective Nygard gave appellant another *Miranda* warning. Appellant disputes that such a warning took place. During the drive to the Sheriff's Office, appellant attempted to initiate conversation with Detective Gautsch concerning whether they may have seen each other in the past. Detective Gautsch informed appellant that he did not wish to talk with him at that time.

After appellant was removed from the farmhouse, some of the investigating officers remained to secure the house pending the obtaining of a search warrant for the house. The remaining officers either escorted appellant and Working to the Wright County Sheriff's Office, or proceeded to a trailer park in Annandale where they had learned the other murder suspect, Dennis Neumann, was staying. The officers placed Neumann under arrest and gave him the *Miranda* warning. Neumann told the officers that he understood his rights. While the arresting officers were driving Neumann to the Wright County Sheriff's Office, he readily told the officers that he and appellant had robbed, abducted and murdered the attendant at the Clark Station in Crystal on October 18. Neumann further stated that he was the one who did the actual shooting but that appellant had known about the murder beforehand. Neumann, after a second *Miranda* warning at the Sheriff's Office, dictated a written statement of his confession and signed it. A copy of that confession was given to Neumann.

Appellant and Detective Gautsch arrived at the Wright County Sheriff's Office at approximately 2:30 in the morning on October 29. Appellant was placed in an interview room with Detective Gautsch and Lieutenant Fitzer of the Crystal Police Department. Detective Sonenstahl soon thereafter entered the room and, for the third time since his arrest, appellant was given the *Miranda* warning. Appellant again said he understood his rights and agreed to talk with the officers. He consented to tell them the entire story, but stated that he did not wish to give a written statement. The appellant proceeded to relate the details of Reitsma's abduction and murder. During this interview, appellant twice indicated that he had known before David was taken into the woods that Neumann was planning to shoot the boy. Again, in his testimony at trial, appellant denied ever making these statements.

The officers concluded their questioning of appellant at approximately 5:30 that morning. At approximately 7:00 the same morning, appellant was taken in a squad car by Detective Sonenstahl and other officers to the Plymouth Police Department.

On the way, Detective Sonenstahl asked appellant if he would show him the location where the murder took place. Appellant agreed, and directed the officers to the location where Reitsma's body had been discovered.

The transport vehicle arrived at Hennepin County Jail a little before 8:00 a. m. When appellant arrived at the jail he offered to give Detective Sonenstahl a written statement.

At appellant's request, he and Neumann were placed in the same cell. At approximately 9:15 a. m., Detective Sonenstahl brought appellant to an interview room at the jail. Appellant dictated a written statement concerning his role in Reitsma's murder. Appellant also dictated a second statement concerning an earlier robbery he and Neumann had committed in Minneapolis. Appellant then read and signed both statements and was given a copy of both statements.

In his statement, appellant admitted knowing that Reitsma was to be shot because the attendant had seen their faces and would be able to identify them. At trial appellant testified that he had given the statement because he had read Neumann's confession and thought he should answer questions the way Neumann had.

Appellant was found guilty of first degree murder. The trial judge denied a defense request for a second degree murder instruction because he believed the evidence did not support such an instruction. The court also refused to instruct the jury under Minn.Stat. § 611.02 that if it had reasonable doubt as to which degree of murder the defendant had committed, it should convict of the lesser degree. This request was made by defense counsel after the jury had been instructed. After the jury verdict, the court accepted appellant's pleas of guilty to the aggravated robbery and kidnapping charges, and a life sentence on the first degree murder charge was imposed.

Appellant raises the following pertinent issues on appeal:

(1) That his arrest was illegal and that evidence obtained thereby should have been suppressed;

(2) That the trial court's refusal to instruct the jury in accordance with Minn. Stat. § 611.02 constitutes prejudicial error;

(3) That the trial court erred in refusing to submit the charge of second degree murder to the jury.

■ 1. Appellant first argues that his arrest was illegal because the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest absent exigent circumstances. This principle was announced by the United States Supreme Court in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, this court has refused to give *Payton* retroactive effect. *See State v. Hinkle*, 310 N.W.2d 97, 99 (Minn.1981); *State v. Galde*, 306 N.W.2d 141, 143 (Minn.1981); *State v. Gant*, 305 N.W.2d 790, 791 (Minn.1981); *Watts v. State*, 305 N.W.2d 860, 862 (Minn.1981); *State v. Smith*, 305 N.W.2d 798, 799 (Minn. 1981). Since *United States v. Johnson*, —— U.S. ——, 102 S.Ct. 2579, 73 L.Ed.2d 202 (U.S.1982), has given retroactive effect to *Payton, supra*, we must overrule these cases to the extent they are inconsistent.

Applying the *Payton* rule to the instant case, the warrantless arrest is still valid. *Payton* permits warrantless, nonconsensual arrests of routine felony suspects in their homes where exigent circumstances are present. *See* 445 U.S. at 583, 100 S.Ct. at 1378. Minnesota has also enunciated this rule. *See State v. Gant*, 305 N.W.2d 790 (Minn.1981); *State v. Lasley*, 306 Minn. 224, 236 N.W.2d 604 (1975), *cert. denied* 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977).

Exigent circumstances are established where a six-factor test is met:

First, that a grave offense is involved, such as a crime of violence; second, that the suspect is believed to be armed; third, that there be a clear showing of probable cause to believe the suspect committed the crime; fourth, strong rea-

son to believe the suspect is on the premises; fifth, a likelihood the suspect will escape if not swiftly apprehended; sixth, that although the entry may not be with consent, it must be peaceable.

*State v. Lasley*, 306 Minn. at 232, 236 N.W.2d at 609, citing *Dorman v. United States*, 140 App.D.C. 313, 435 F.2d 385 (1970). Analyzing the facts of appellant's case using this test, we find that exigent circumstances existed. First, the armed robbery, abduction, and murder of a 15-year-old boy is without doubt a grave offense. Second, the arresting officers were aware that appellant and another individual, possibly codefendant Dennis Neumann, were in the house and that either or both could have been armed. The desire to quickly remove the dangers to themselves and others in the community posed by an armed felon has been viewed as an exigent circumstance. *See id.; Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Third, the officers had probable cause to believe that appellant had committed the crime. Appellant concedes this point. Fourth, surveillance by the police revealed that appellant had entered the premises one hour before and had not been seen leaving. Fifth, because of the large numbers of officers involved in the investigation and the rapidity with which the evidence was conclusively pointing to appellant, police could reasonably have feared that word would leak to appellant at any time and he would then attempt to escape. Sixth, the entry was peaceable. The door was opened by appellant and there was no violent struggle in securing the suspect. *Dorman v. United States* does not require the entry to be consensual to be peaceable. 435 F.2d at 393.

The following Minnesota statutes governed warrantless arrests at the time appellant was arrested:

Arrest is the taking of a person into custody that he may be held to answer for a public offense, and may be made; * * *

(2) by a police officer without a warrant * * *.

Minn.Stat. § 629.30 (1974).

ARREST WITHOUT WARRANT. A peace officer may, without warrant, arrest a person: * * *

(2) When the person arrested has committed a felony, although not in his presence;

(3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it; or

(4) Upon a charge made upon reasonable cause of the commission of a felony by the person arrested. To make such arrest the officer may break open an outer or inner door or window of a dwelling house if, after notice of his office and purpose, he shall be refused admittance.

Minn.Stat. § 629.34 (1974).

ARREST AT NIGHT. Such peace officer may at night, without a warrant, arrest any person whom he has reasonable cause for believing to have committed a felony, and shall be justified in making such arrest, though it shall afterwards appear that no felony has been committed; but when so arresting a person without a warrant, the officer shall inform him of his authority and the cause of the arrest, except when he shall be in the actual commission of a public offense, or shall be pursued immediately after an arrest.

Minn.Stat. § 629.35 (1974).

Appellant takes the position that the so-called "no knock" provision of Minn.Stat. § 629.34 (1974) was violated because the police failed to give notice of their office and purpose prior to entry. The state correctly points out, however, that this court has repeatedly upheld arrests where police have dispensed with the announcement of authority and purpose when exigent circumstances have existed or when such an announcement would be a useless gesture. *See, e.g., State v. Clark*, 312 Minn. 44, 250 N.W.2d 199 (1977); *State v. Linder*, 291 Minn. 217, 190 N.W.2d 91 (1971).

In the context of this arrest, announcement of office and purpose would have been a useless gesture or senseless ceremony as those terms have been defined by the United States Supreme Court in *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Here "the facts known to the officers would justify them in being virtually certain" that the suspect "already [knew] their purpose." *Id.* at 310, 78 S.Ct. at 1196. Fourteen police officers in police cars openly approached the house. Appellant testified that he saw their headlights. Finally, the officers knocked, appellant came to the door (which had a window in it), and opened it to admit the officers.

Therefore, appellant's arrest did comply with *Payton* because the exigent circumstances test was met and the arrest met the requirements of state statutes.

2. Minn.Stat. § 611.02 (1974) provides that:

> Every defendant in a criminal action is presumed innocent until the contrary is proved and, in case of a reasonable doubt, is entitled to acquittal; and when an offense has been proved against him, and there exists a reasonable doubt as to which of two or more degrees he is guilty, he shall be convicted only of the lowest.

■ The trial judge found his refusal to give an instruction in accordance with Minn.Stat. § 611.02 (1974) to be non-prejudicial error. In any event, the jury instructions actually given substantially protected the appellant's right to be acquitted if the jury had a reasonable doubt concerning any element of a charge. Further, this case does not present the situation referred to by the second clause of the statute concerning different degrees of a crime. This court held in *State v. Dahlstrom*, 276 Minn. 301, 150 N.W.2d 53 (1967), that the failure to give the § 611.02 instruction was "not sufficient in and of itself to require a new trial." *Id.* at 311, 150 N.W.2d at 60–61. It, therefore, is certainly not reversible error under the facts and procedural circumstances of this case.

■ 3. Appellant's final contention is that the trial court should have submitted the charge of second degree murder to the jury. The trial judge refused because he felt the evidence could not support a conviction for second degree murder. The law clearly provides for the right to refuse to submit a lesser degree of a crime where the evidence cannot support it. *See State v. Lee*, 282 N.W.2d 896 (Minn.1979); *State v. McDonald*, 312 Minn. 320, 321–22, 251 N.W.2d 705, 706 (1977). The question then becomes whether the evidence presented could support a conviction of murder in the second degree.

■ Second degree murder is, of course, an intentional killing without premeditation. *See* Minn.Stat. § 609.19 (1974). The state directs this court's attention to the Comment to Crim. JIG 11.02, wherein it is stated:

> The charge as to the lesser offense of murder in the second degree has been included, because under the decision in *State v. Hyleck*, [268 Minn. 126, 175 N.W.2d 163 (1970)], it seems there are few cases in which murder in the second degree is not a lesser-included offense. *When the killing is alleged to have been done by another at the instigation of defendant, it is possible that only a charge of murder in the first degree would be appropriate.*

(Emphasis added.) The Comment describes the situation presented by this case where the jury was faced with the choice of believing appellant's confession, which indicated that he and Neumann planned to kill Reitsma because he could identify them, or instead, believing his statements on the witness stand that he had no idea Neumann would shoot Reitsma.

The only evidence that appellant believes supports a second degree murder conviction is the evidence of his drinking prior to the incident. However, appellant did not indicate that his drinking had caused him to intend the killing, but not plan it. Appellant consistently stated at trial that he had no foreknowledge of the killing. We find therefore that the trial court was correct.

Affirmed.

PETERSON, J., took no part in the consideration or decision of this case.