STATE of Minnesota, Respondent,

v.

Peter Dean PAUL, Appellant.

No. C2–94–2469.

Supreme Court of Minnesota.

May 23, 1996.

Richard L. Swanson, Chaska, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Scott Joint Prosecution Ass'n, Lisa A. Skoog, Patrick Ciliberto, Shakopee, for respondent.

## OPINION

ANDERSON, Justice.

Appellant Peter Dean Paul was arrested at his home in Jordan, Minnesota, and charged with the misdemeanor offense of driving under the influence of alcohol. At the omnibus hearing, Paul pleaded not guilty to the charge of driving under the influence of alcohol and moved to suppress all evidence obtained against him on the grounds that the police officer's warrantless entry into his home to make the arrest violated the Fourth Amendment. The district court denied the motion, ruling that the officer's warrantless entry into Paul's home was justified under the doctrine of hot pursuit and thus did not violate the Fourth Amendment. Paul waived his right to a jury trial, entered a conditional guilty plea, and appealed to the Minnesota Court of Appeals, which affirmed the conviction. We affirm.

At approximately 6:00 p.m. on February 22, 1994, in Jordan, Minnesota, Joseph A. Gunderson, a uniformed and on-duty police officer with the Jordan Police Department, was in an auto parts store. While in the store, Officer Gunderson was approached by appellant, Peter Dean Paul, who wrapped his arm around Gunderson's shoulder and said, "Hi, how is it going?" Gunderson did not know Paul, but replied, "Fine, how are you doing?" Gunderson asked Paul if he knew him, and Paul replied, "I don't think so." Gunderson and Paul then talked for several minutes about Paul's red pickup truck. During this conversation, Gunderson noticed a strong smell of alcohol and observed that Paul slurred his speech, had watery eyes and a flushed face, and had some difficulty standing. Gunderson later testified that he concluded Paul was intoxicated and speculated that Paul had walked over from a bar located approximately 40 feet from the auto parts store. Gunderson did not ask Paul if he was going to drive that evening.

After completing his business at the auto parts store, Officer Gunderson left the store and walked to a gas station located next door. After spending four to five minutes at the gas station, Gunderson went to his squad car. As he was about to enter his squad car, Gunderson saw Paul walk out of the auto parts store and climb into a red pickup truck, which was parked approximately 15 to 20 feet away from Gunderson's squad car. Gunderson watched Paul start the truck and drive out of the parking lot and observed him roll through a stop sign at the exit of the parking lot. Gunderson testified that he concluded Paul should not be driving and decided to follow him to observe his driving behavior.

Because there were other cars leaving the parking lot, Officer Gunderson was unable to immediately follow Paul. Gunderson caught up to Paul's truck at the intersection of Highway 169 and Creek Lane, where he observed Paul roll through the stop sign, turn onto Highway 169, and "fishtail" as he entered the highway. Because Gunderson did not feel "comfortable" with Paul's driving on the highway, he called in Paul's license plate number and turned on his red squad car lights. Paul did not stop when the red squad car lights were activated, but continued to drive on the highway at a "fast" speed. After driving for a short distance on Highway 169, Paul turned onto Syndicate Street, the street on which he lives. Gunderson followed Paul for approximately two blocks on Syndicate with his red squad car lights on, when Paul drove into the driveway of a home at 500 Syndicate Street.

Officer Gunderson followed Paul into the driveway of the home at 500 Syndicate Street and parked his squad car directly behind Paul's truck so that Paul could not back up. As Paul was getting out of his truck, Gunderson commanded him to stop and to get back into his truck. Paul did not comply with Gunderson's command. Gunderson again ordered Paul to get back into his truck. Paul shut the door of his truck and turned away from Gunderson, who again commanded him to stop. As Gunderson left the side of his

squad car and began to run towards Paul, Paul "hastily" went up to the side door to his garage. Gunderson chased Paul towards the garage, but was unable to continue his pursuit and follow Paul into the garage because, after entering the garage, Paul locked the side door behind him.

After first attempting to open the locked door, Officer Gunderson knocked on the door and shouted, "Sir, come on out, answer the door, come out and talk to me." Receiving no response, Gunderson then went to the front of the house and knocked on the front door. A woman, later identified as Paul's wife, answered the door. Gunderson asked her to get her "husband" so that he could talk to him. She replied that he was not at home. Gunderson then asked Paul's wife to look for Paul in the house, which she claimed to do. While she searched for Paul, Gunderson heard persons speaking in the house. Within moments, Paul's wife returned and told Gunderson that Paul did not appear to be home. Gunderson replied that if she was lying to conceal the presence of her husband, she could be charged with a crime. Gunderson then asked her if he could look about the residence for Paul and she replied, "Go right ahead."

Officer Gunderson entered the house and, accompanied by Paul's wife, looked for Paul in the kitchen and garage. Unable to locate Paul, Gunderson again questioned Paul's wife. When he told her that he had overheard her talking to someone in the kitchen area, she stated that she was "talking to herself" and began to shout at Gunderson. At that point, Paul emerged from the basement. Gunderson then arrested Paul for driving under the influence of alcohol pursuant to Minn.Stat. § 169.121. Paul was then taken to the police station where he was given a blood-alcohol level test, which disclosed a blood alcohol concentration of 0.22. Paul also was given but was unable to complete any of the field sobriety tests. Gunderson issued Paul a citation for the misdemeanor offense of driving under the influence of alcohol.

Paul's wife presented a different version of the events. She testified that after hearing something slam, she went to a window, saw Paul's truck in the driveway, and noticed Officer Gunderson's squad car pulling to a stop behind it. She testified that the squad car lights were not flashing. She went to the front door, opened it, looked out and saw Gunderson trying to open the garage door. When Gunderson came to the front door and asked her to look for Paul, she shut the front door, leaving Gunderson standing outside. She looked throughout the house, calling Paul's name, and when she returned to the front of the house, she found Gunderson standing in the living room.

At the omnibus hearing, Paul pleaded not guilty and moved to exclude all evidence obtained from him after Officer Gunderson's warrantless entry into his home. The district court denied Paul's motion, concluding that Paul's constitutional rights were not violated by Gunderson's warrantless entry of his home because Gunderson's hot pursuit of Paul fell under the exigent circumstances exception to the warrant requirement. Paul then waived his right to a jury trial, entered a conditional guilty plea pursuant to *State v. Lothenbach*, 296 N.W.2d 854, 857 (Minn. 1980), and appealed the denial of this motion to suppress evidence on constitutional grounds to the court of appeals, which affirmed.

On appeal to this court, Paul argues that Gunderson did not have probable cause to arrest him, that Gunderson was neither in hot pursuit nor had he set an arrest in motion, and that exigent circumstances do not justify a warrantless entry into a home to arrest for an offense of lesser magnitude than a felony. Accordingly, Paul asks that we reverse the court of appeals and hold that the evidence obtained as a result of the warrantless entry and arrest by Gunderson must be excluded.

I.

 Paul seeks to suppress all evidence obtained against him on the grounds that Officer Gunderson's warrantless entry into his home violated the Fourth Amendment. This court will only reverse a pretrial decision of the district court to suppress evidence if the state demonstrates clearly and unequivocally that the district court has erred

in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial. *State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977). When the facts are not in dispute and the district court's decision is a question of law, this court may independently review the facts and determine as a matter of law whether the evidence need be suppressed. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn.1992).

■■ The Fourth Amendment to the United States Constitution and Article I of the Minnesota Constitution proscribe unreasonable searches by the government of "persons, houses, papers and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. Absent exigent circumstances, a warrantless entry of a person's house to make an arrest is per se unreasonable. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980); *State v. Lohnes*, 344 N.W.2d 605, 610 (Minn.1984). To justify a warrantless entry of a person's home in order to make an arrest, the state must show either consent[1] or probable cause and exigent circumstances. *Othoudt*, 482 N.W.2d at 222. The United States Supreme Court has determined that exigent circumstances exist in cases of hot pursuit, danger to human life, imminent destruction of evanescent evidence, and possible flight of a suspect. *Lohnes*, 344 N.W.2d at 610. If a warrantless entry is made without probable cause and exigent circumstances, its fruit must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963).

Paul argues that the doctrine of hot pursuit does not apply to the facts of this case because Officer Gunderson did not have probable cause to arrest him prior to entering his home and because Gunderson was neither in hot pursuit nor had he set an arrest in motion prior to his warrantless entry of Paul's home.

■■ We first consider Paul's argument that Officer Gunderson did not have probable cause to arrest Paul for the offense of driving under the influence of alcohol. In order to establish probable cause, the police must show that they "reasonably could have believed that a crime has been committed by the person to be arrested." *State v. Olson*, 436 N.W.2d 92, 94 (Minn.1989) (citing *State v. Merrill*, 274 N.W.2d 99, 108 (Minn.1978)), *aff'd*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The record reflects that while in the auto parts store, Gunderson smelled alcohol on Paul, heard his slurred speech, saw his watery eyes and flushed face, watched him experience difficulty standing, and was the subject of Paul's alcohol-induced gregariousness. After Paul got in his truck, Gunderson observed Paul roll through several stop signs, exceed the speed limit, and "fishtail" on a highway. Based on these facts, Gunderson had ample evidence to believe that Paul had committed the offense of driving under the influence of alcohol. *See also Costillo v. Commissioner of Pub. Safety*, 416 N.W.2d 730, 733 (Minn.1987) (observing bloodshot eyes, strong odor of alcohol, slurred speech contributed to a determination of probable cause that driver was under the influence of alcohol).

■ We next consider whether Officer Gunderson was in hot pursuit or had set an arrest in motion prior to his warrantless entry of Paul's home. In *United States v. Santana*, the Supreme Court held that a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of retreating to a private place. 427 U.S. 38, 43, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976). In that case, the suspect, Santana, was standing in the doorway of her house when the police pulled up in a van, shouted "police," and displayed their identification. *Id.* at 40, 96 S.Ct. at 2408. As the officers approached, Santana retreated into the vestibule of her house. The officers followed her through the open door, catching her in the vestibule. In the ensuing struggle, bundles of marked money and heroin fell to the floor. *Id.* at 40–41, 96 S.Ct. at 2408–09. Santana moved to suppress the marked money and heroin seized during and after her arrest.

The Supreme Court denied Santana's motion to suppress on the grounds that Santa-

---

1. Consent is not at issue in this appeal.

na's act of retreating into her house could not thwart an otherwise proper arrest. Although the Court noted that hot pursuit usually means some sort of a chase, "it need not be an extended hue and cry 'in and about [the] public streets.' The fact that the pursuit here ended almost as soon as it began did not render it any less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house." *Id.* at 43, 96 S.Ct. at 2410.

We reached a similar result in *State v. Koziol,* where we held that a person may not defeat a warrantless arrest which has been set in motion in public by entering into his dwelling. 338 N.W.2d 47, 48 (Minn.1983). In *Koziol,* a police officer lawfully attempted to stop a van in which the defendant was riding. While the officer was approaching the stopped van, the defendant unexpectedly sped away. A chase ensued, leading to the defendant's apartment, where the defendant got out of the van and ran into his apartment. The police went to the apartment and, when the defendant did not answer their knocks and announcements of authority, entered with a key they had obtained. The defendant was then taken outside his apartment, where he made an inculpatory statement. The defendant moved to suppress his statement. We declined to suppress the defendant's statement because the police clearly were in hot pursuit of the defendant when they followed him to his apartment, and were thus justified in entering the apartment without a warrant to arrest him. *Id.* at 48.

*Santana* and *Koziol* illustrate that the doctrine of hot pursuit applies whether police officers engage in a high-speed chase of the suspect as in *Koziol,* or merely approach a suspect who immediately retreats into a house as in *Santana.*[2] The hot pursuit in this case falls between these two examples. Here, Officer Gunderson, with his red squad car lights on, followed Paul on the highway and for two blocks on Syndicate Street.

When Paul pulled into his driveway and parked his truck, Gunderson ordered him to stay in his vehicle. After Paul got out of his vehicle and went hastily towards his garage, Gunderson several times ordered him to stop. Based on these facts, Gunderson was clearly in hot pursuit of Paul.

■ In addition to being in hot pursuit, Officer Gunderson also had set an arrest in motion before he entered Paul's home without a warrant. In *In re Welfare of E.D.J.,* we held that a Fourth Amendment seizure occurs when the police direct an individual to stop. 502 N.W.2d 779, 783 (Minn.1993). In *E.D.J.,* we concluded that the test for a "seizure" under the Minnesota Constitution is whether a reasonable person would have concluded that he or she was not free to leave. Once the police tell someone to stop, a "seizure" occurs for Fourth Amendment purposes. *Id.* In this case, Gunderson turned on his red squad car lights signalling for Paul to stop and Gunderson commanded Paul to stop several times before Paul fled into his home. Based on our holding in *E.D.J.,* Gunderson set in motion an arrest which Paul could not stop by retreating into his home. *See Koziol,* 338 N.W.2d at 48.

### II.

■ We next consider Paul's assertion that even if Officer Gunderson was in hot pursuit and an arrest had been set in motion, a police officer may not make a warrantless entry into a home to make an arrest for an offense of lesser magnitude than a felony.

We have previously upheld the warrantless entry of a home by police in hot pursuit of a suspect when the underlying offense was less than a felony. *See Koziol,* 338 N.W.2d at 47–48 (approving warrantless entry of home for gross misdemeanor offense of fleeing police officer after police officer stopped defendant

---

2. The dissent asserts that the "officer's behavior prior to knocking on the front door of Paul's home was at best 'lukewarm pursuit.'" The dissent could have used any number of adjectives to describe the pursuit—mild, temperate, tepid, etc.—but legally, the adjective used makes no difference, because the concept of "lukewarm pursuit" has no basis in the criminal law. The

U.S. Supreme Court recognized in *Santana* that although hot pursuit usually means some sort of a chase, "it need not be an extended hue and cry 'in and about [the] public streets.'" 427 U.S. at 43, 96 S.Ct. at 2410. However labelled, Gunderson engaged in a hot pursuit under the facts and circumstances of this case.

to warn him of speeding).[3] Paul essentially asks this court to overturn *Koziol* and to adopt a bright-line rule prohibiting warrantless arrests in the home when the underlying offense is of lesser magnitude than a felony. As support, Paul cites dicta in *Othoudt*, where we stated that neither the United States Supreme Court nor the Minnesota Supreme Court has ever held that exigent circumstances would "permit a warrantless entry into a home to arrest for an offense of lesser magnitude than a felony." 482 N.W.2d at 223–24.

Paul's reliance on and the dissent's citation to *Othoudt* is misplaced, for that case did not involve an officer in hot pursuit of a suspect because the officer did not observe the offense and was not in hot pursuit. We would not permit the warrantless entry into Othoudt's home because the legislature has determined that an officer may not make a warrantless entry into a home to arrest for a misdemeanor offense unless the individual committed the offense in the officer's presence. *See* Minn.Stat. § 629.34, subd. 1(c)(1), 1(d) (1994). This statute places a substantial limitation on the powers of arrest of police officers and ensures that citizens who commit misdemeanor offenses outside of the presence of police officers will remain secure in the privacy of their homes. But because Officer Gunderson observed the offense at issue here and was in hot pursuit, neither the statute nor the dicta in *Othoudt* apply.

Paul also argues that the warrantless entry of his home was not permissible under the standard set forth by the United States Supreme Court in *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Welsh*, the Supreme Court held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made," and that

a warrantless entry in the home should "rarely be sanctioned when there is probable cause to believe that only a minor offense" has been committed. *Id.* at 753, 104 S.Ct. at 2099. Because the underlying offense in *Welsh* was a noncriminal, civil forfeiture offense for which no imprisonment was possible, the Court held that a warrantless entry was not proper for such a minor offense. *Id.* at 755, 104 S.Ct. at 2100.

Subsequent to the Supreme Court's holding in *Welsh*, numerous state courts have held that a police officer in hot pursuit of a person suspected of driving under the influence of alcohol may make a warrantless entry into the suspect's home.[4] These courts have distinguished *Welsh* on three main grounds: (1) the officer was in hot pursuit; (2) there was a need to preserve evidence of the defendant's blood alcohol level; and (3) the ordinance or statute under which the defendant was arrested provided for criminal penalties and not merely noncriminal civil forfeitures.

We find that Paul's reliance on *Welsh* is misplaced for the three reasons set forth above. The present case is distinguishable from *Welsh* because Officer Gunderson was in hot pursuit of Paul. In contrast, *Welsh* did not involve the hot pursuit of a suspect because there was "no immediate or continuous pursuit of the petitioner from the scene of a crime." 466 U.S. at 753, 104 S.Ct. at 2099.

We also find that the need to preserve evidence of Paul's blood alcohol level is a compelling exigent circumstance under the "destruction of evidence" exception to the warrant requirement first recognized by the Supreme Court in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In *Schmerber*, the police, who arrested Schmerber for driving under the influence of alcohol, took a sample of Schmerber's

---

**3.** *See also Pahlen v. Commissioner of Pub. Safety*, 382 N.W.2d 552, 553–54 (Minn.App.1986) (approving warrantless entry of home after arresting officer observed defendant committing petty misdemeanor traffic offense of speeding).

**4.** *See City of Kirksville v. Guffey*, 740 S.W.2d 227 (Mo.Ct.App.1987); *City of Beachwood v. Sims*, 98 Ohio App.3d 9, 647 N.E.2d 821 (1994); *Winter v. State*, 902 S.W.2d 571 (Tex.Ct.App.1995); *City of Orem v. Henrie*, 868 P.2d 1384 (Utah.Ct.App. 1994); *State v. Griffith*, 61 Wash.App. 35, 808 P.2d 1171 (1991); *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987); *see also Patzner v. Burkett*, 603 F.Supp. 1139 (D.N.D.1985) (qualified immunity applied to shield deputy sheriff and volunteer special deputy from liability for warrantless home arrest for driving under the influence).

blood over his objection. The Court held that the warrantless removal of Schmerber's blood was necessary to prevent the destruction of the most probative evidence of Schmerber's offense, noting that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* at 770, 86 S.Ct. at 1836.

Based on the reasoning of the Supreme Court in *Schmerber*, we reached a similar result in *State v. Storvick*, concluding that officers properly entered a home without a warrant where the defendant had been drinking and the officers needed to act as quickly as possible to ascertain the defendant's blood alcohol level before the evidence dissipated. 428 N.W.2d 55, 60 (Minn.1988). Although *Storvick* involved several felony offenses, the present case presents similar compelling exigent circumstances. If Officer Gunderson had not immediately entered Paul's home, Paul's blood alcohol level might have dissipated while a warrant was being obtained, or Paul might have drunk more alcohol, making a chemical test unreliable. *See Storvick*, 428 N.W.2d at 58 (defendant informed arresting officers that "I drank after I got home" in an attempt to thwart the state's attempt to collect evidence against him). Based on our holding in *Storvick*, we conclude that exigent circumstances were present which justified Gunderson's warrantless entry into Paul's home.

The present case also is distinguishable from *Welsh* because the misdemeanor offense of driving under the influence of alcohol is a serious one under Minnesota law. Although *Welsh* also involved a drunk driving offense, the State of Wisconsin had chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment was possible. *Welsh*, 466 U.S. at 754, 104 S.Ct. at 2100, citing Wis. Stat. § 346.65(2) (1975); § 346.65(2)(a) (Supp.1983–1984). For this reason, the Court concluded that the offense was a minor one under Wisconsin law. *Id.* However, the Court in *Welsh* emphasized that the penalty which a state attaches to a particular offense provides "the clearest and most consistent indication of the State's in-

terest in arresting individuals suspected of committing that offense." *Id.* at 754 n. 14, 104 S.Ct. at 2100 n. 14.

The legislature of this state has clearly and consistently indicated that driving under the influence of alcohol is a serious offense. The statute under which Paul was charged, Minn. Stat. § 169.121, is classified as a *criminal* offense for which imprisonment is possible. Along with being classified as a criminal offense, other factors that evince the seriousness of the offense include: (1) defendants charged with driving under the influence of alcohol are guaranteed the right to a jury trial; (2) the legislature has authorized warrantless arrests for this offense when it occurs outside the officer's presence, Minn. Stat. § 169.121, subd. 1b; and (3) license revocation is mandatory for all convictions of driving under the influence, Minn.Stat. § 169.121, subd. 4; Minn.Stat. § 169.123. *See also State v. Hanson*, 543 N.W.2d 84, 89 (Minn.1996) (discussing legislative amendments to DUI statute to "give it more teeth"). Because the legislature has clearly manifested that driving under the influence of alcohol is a serious offense, *Welsh* is distinguishable from the present case. We therefore hold that an officer in hot pursuit of a person suspected of the serious offense of driving under the influence of alcohol may make a warrantless entry into the suspect's home in order to effectuate an arrest.

■ Paul urges us to go beyond the facts of this case and to adopt a bright-line rule prohibiting the warrantless entry of a home when the underlying offense is of lesser magnitude than a felony, but we decline to adopt such a rule. A bright-line felony rule would allow the perpetrator of certain serious misdemeanor offenses to avoid punishment merely because of how the legislature had labelled an infraction. Moreover, in dealing with criminal behavior such as driving under the influence of alcohol, we do well to heed Justice Holmes' sage advice:

> If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict, not as a good one, who finds his reasons for conduct, whether inside the

law or outside of it, in the vaguer sanctions of conscience.

Oliver W. Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 459 (1897). A bright-line felony rule would send a message to the "bad man" who drinks and drives that a hot pursuit or an arrest set in motion can be thwarted by beating the police to one's door. The Fourth Amendment simply cannot be stretched nor can public safety be ensured by a bright-line felony rule which would encourage drunk drivers to elude the police by racing through the streets to the sanctuary of their homes in order to "freeze" a hot pursuit or to otherwise evade a lawful arrest.

We are equally unpersuaded that a bright-line felony rule would aid law enforcement. The determination of whether an offense is a felony or a serious misdemeanor is not one that we should force officers to make on the spot in the tense and often dangerous circumstances of hot pursuit. *See Payton*, 445 U.S. at 619, 100 S.Ct. at 1396–97 (White, J., dissenting). Adopting a bright-line rule based on the legislature's classification of conduct as a misdemeanor would also sweep away any possibility that warrantless home arrests would be justified for those misdemeanors in which the underlying conduct is serious, or when the underlying offense is minor, but subsequent activity by the perpetrator during his flight from the police elevates the situation to a serious one. Further, this approach does not, as the dissent suggests, "impugn the intelligence" of police officers; rather, it recognizes the increased complexity of the criminal code and the blurring of the once-clear distinction between felonies and serious misdemeanor offenses.

The Fourth Amendment draws a firm line at the entrance to the home, but the Supreme Court has declined to adopt a bright-line felony rule which would bar a warrantless entry of a home because the underlying offense is a misdemeanor. *See Welsh*, 466 U.S. at 752–53, 104 S.Ct. at 2099.[5] We similarly decline to adopt a bright-line felony rule. Our decision today should not be read, however, as providing a green light for offi-cers to make a warrantless home arrest whenever evidence is needed in a drunk driving investigation. Contrary to the dissent's assertion that "[w]hat the majority does today is allow an officer in the field to make the determination for warrantless entry into a private dwelling," we hold only that an officer in hot pursuit of a person suspected of the serious offense of driving under the influence of alcohol may make a warrantless entry into the suspect's home in order to effectuate an arrest.

Affirmed.

TOMLJANOVICH, Justice, dissenting.

"[I]n Fourth Amendment cases, courts define the scope of protection from unreasonable searches and seizures by asking whether a person has a 'reasonable expectation of privacy' in the searched premises." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 577 n. 1 (Minn.1994). If there is any place in the world we should feel secure and have an expectation of privacy, it is in our own homes. Today, the majority has made us less secure in those homes without enhancing public safety.

I believe, as do the majority of thinking people, that drunk driving is a very serious offense. I agree that drunk drivers should be removed from the public highways because their actions are intolerable. But it is more intolerable to allow a police officer, who watches an obviously intoxicated person get into his vehicle and drive off, imperiling the safety of the motoring public, to then imperil the security of that person in his own home in the name of public safety. I respectfully dissent.

I would hold that even with hot pursuit and exigent circumstances a warrantless entry into a home for a misdemeanor offense is unreasonable. We have noted in similar cases that neither our state nor federal courts have ever held that exigent circumstances would "permit a warrantless entry into a home to arrest for an offense of lesser

---

**5.** We note the dissent's references to the orations of William Pitt; however, nothing in this opinion would permit the warrantless entry of a home for the nonpayment of an excise tax or any other civil infraction.

magnitude than a felony." *State v. Othoudt*, 482 N.W.2d 218 (Minn.1992).

Peter Dean Paul was arrested in his home by Officer Gunderson who witnessed what he believed to be intoxicated behavior on the part of Paul in a local auto parts store. Gunderson testified that Paul's eyes were glassy, his balance was unstable, his speech was slurred, and he smelled of alcohol. Gunderson however, did not detain or stop Paul when he climbed into his truck to drive away. Gunderson waited until *after* Paul left the parking lot of the store before following him in his squad car. He followed Paul over a half mile and witnessed Paul roll through two stop signs, travel very fast on a highway and fishtail on the road. Paul exited the highway and headed down a residential street to his home. Paul continued for two more blocks and pulled into a driveway in front of a residence, Gunderson then pulled in "bumper to bumper" with Paul's vehicle so the car would not be able to leave the driveway.

The record does not reflect that Gunderson tried to stop Paul before he left the parking lot; nor does it indicate that he tried to pull him over when he entered the public roadway. The officer's behavior prior to knocking on the front door of Paul's home was at best "lukewarm pursuit" of a person suspected of DWI and traffic violations; all misdemeanors. Officer Gunderson did not identify his purpose and did not place Paul under arrest until Paul was in his home and Officer Gunderson had entered that home without warrant, emergency or exigent circumstance.

Paul was not in his car, he was in his home. Public safety would not have been compromised if the arrest had been delayed until the officer could have secured a warrant. The majority argues that hot pursuit, "the need to preserve evidence" and the statute gave the officer the right to enter the home. Presumably the evidence to be preserved related to a blood or breath test to measure the alcohol in Paul's blood. But DWI arrests were made and convictions were obtained before blood or breath tests were routinely used. The results of the breath test would make it easier to obtain a conviction, but if the officer was credible, as

he apparently was, his observations would have been sufficient to merit a conviction. Ease of obtaining a conviction should not be enough to permit a warrantless entry into a home to effectuate a misdemeanor arrest.

The Minnesota Constitution is clear on unreasonable searches and seizures. Minn. Const. art. I, § 10. Our laws have provided for limited entry under warrant, consent, emergency or exigent circumstances when a *felony* is involved. We should not stretch that limitation to break the promise of the constitutional rights of our citizens to be secure in their homes. The majority would have us bend the constitutional promise to include warrantless entry into a person's home for gross misdemeanor and misdemeanor offenses where exigent circumstances exist. The framers of the Fourth Amendment incorporated the warrant requirement into it, "reflecting their conviction that the decision to enter a dwelling should not rest with the officer in the field, but rather with a detached, and disinterested Magistrate." *Payton v. New York*, 445 U.S. 573, 582 n. 17, 100 S.Ct. 1371, 1377 n. 17, 63 L.Ed.2d 639 (1980). What the majority does today is allow an officer in the field to make the determination for warrantless entry into a private dwelling. It is here that I disagree. The majority would impugn the intelligence of our police officers by telling us that the officers cannot know whether an offense is a felony or misdemeanor before entering a home. Police officers know the law; they know whether they have a felony or misdemeanor on their hands.

While the majority claims to maintain the sanctity of the home, it would reduce our rights to that sanctity by allowing an officer with exigent circumstances, based on his/her experience and opinion, not the opinion of a neutral magistrate, to enter a citizen's home without a warrant to arrest a suspect for a misdemeanor or gross misdemeanor.

Over 200 years ago, the Earl of Chatham, William Pitt, spoke before the House of Commons in protest of unreasonable searches and seizures within the confines of a private dwelling. He said: "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may

shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his forces dares not cross the threshold of the ruined tenement!" *Miller v. United States,* 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (citing William Pitt, Earl of Chatham, in his address to the House of Commons in England in 1763, regarding searches of private dwellings incident to enforcement of an excise tax on cider). Our forefathers believed as passionately in the sanctity of the home as do I. They drafted the Fourth Amendment to deny federal law enforcement such intrusive entry and the Fourteenth Amendment extended that restriction to state law enforcement personnel as well. Our own Minnesota Constitution echoes those same tenets and we should not now decide that the Crown may enter with the storm!

GARDEBRING, Justice, dissenting.

I join in the dissent of Justice Tomljanovich.

PAGE, Justice, dissenting.

I join in the dissent of Justice Tomljanovich.