**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1689**

State of Minnesota,
Respondent,

vs.

Heather Marie Mangen,
Appellant.

**Filed July 14, 2025
Affirmed
Johnson, Judge**

Brown County District Court
File No. 08-CR-23-224

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Patrick Vollmer, Flaherty & Hood, P.A., St. Paul, Minnesota (for respondent)

Luis Moreno, Kohlmeyer Hagen Law Office, Chtd., Mankato, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Johnson, Judge; and Smith, Tracy M., Judge.

**SYLLABUS**

To determine whether a law-enforcement officer's hot pursuit of a suspected misdemeanant presents exigent circumstances justifying a warrantless entry into a home, a court must consider, on a case-by-case basis in light of the totality of the circumstances, the nature of the crime, the nature of the flight, and the surrounding facts.

## OPINION

**JOHNSON**, Judge

Heather Marie Mangen was convicted of refusal to submit to chemical testing after a stipulated-evidence court trial. Mangen challenges the district court's denial of her motion to suppress evidence. We conclude that a police officer lawfully stopped Mangen's vehicle because the officer had a reasonable, articulable suspicion that she had committed a traffic violation. We also conclude that police officers lawfully entered Mangen's home without a warrant because the officers were in hot pursuit of her, the officers had probable cause to arrest her, and exigent circumstances were present. Therefore, we affirm.

## FACTS

During the evening of February 18, 2023, a New Ulm police officer, Officer Forrest, observed Mangen's red Toyota minivan drive on and cross over the center line. Officer Forrest followed Mangen for approximately one block and then activated his squad car's emergency lights. Mangen continued to drive for approximately one-half of a block before she pulled into an alley and parked on a paved driveway next to a detached garage behind her house.

Officer Forrest parked his squad car behind Mangen's vehicle. Both Officer Forrest and Mangen exited their vehicles. Officer Forrest asked Mangen for her driver's license and proof of insurance and told her that he had seen her vehicle cross over the center line. During this interaction, Officer Forrest observed that Mangen was unsteady on her feet, fumbled while looking for the documents he had requested, was slow to respond to his questions, smelled of alcohol, and had glassy eyes. Officer Forrest asked Mangen whether

2

she had been drinking, and she responded that she had had a "couple of beers" while visiting her daughter.

Officer Forrest asked Mangen to perform field sobriety tests. The horizontal-gaze-nystagmus test indicated impairment, she performed poorly on the one-legged-stand test, and she was unable to complete the walk-and-turn test because she was "swaying" too much. Approximately ten minutes after their first interaction, Officer Forrest asked Mangen whether she would take a preliminary breath test (PBT), and she agreed. Officer Forrest told her to "stand over right here" behind her vehicle while he went to his squad car to retrieve a PBT device.

After retrieving the PBT device, Officer Forrest walked back toward Mangen's vehicle, but Mangen was not there. He encountered another police officer, Sergeant Murphy, who said that he had seen Mangen enter the back door of her house. Officer Forrest told Sergeant Murphy that he was in the process of arresting Mangen for DWI and had told her "not to leave."

Officer Forrest ran across Mangen's backyard toward her house. He approached the back door and attempted to open it, but it was locked. He knocked on the door for more than two minutes and called for Mangen to come to the door. Officer Forrest said to Sergeant Murphy and a third officer that he could see Mangen inside the house through a window in the back door.

After approximately four minutes, Mangen unlocked the back door, opened it slightly, and spoke to the officers across the threshold. When Sergeant Murphy reminded her that Officer Forrest had told her to remain by her vehicle, she responded, "I don't know

3

what you're talking about." Sergeant Murphy told Mangen that the officers were "going to step in," and then they walked through the doorway into a foyer. Officer Forrest asked Mangen whether she would take a PBT, and she refused, claiming that she had not left her home all evening. Officer Forrest observed that Mangen had changed clothes since entering her home, but he saw the jacket she previously had worn hanging on a hook by the back door.

The officers arrested Mangen for driving while impaired (DWI). Officer Forrest transported her to the county jail, where he read her the implied-consent advisory and requested a breath test. Mangen refused to provide a sample of her breath.

The state charged Mangen with second-degree refusal to submit to chemical testing (a gross misdemeanor), in violation of Minn. Stat. § 169A.20, subd. 2(1) (2022), and third-degree driving while impaired (also a gross misdemeanor), in violation of Minn. Stat. § 169A.20, subd. 1(1) (2022).

In July 2023, Mangen moved to suppress the evidence that was obtained as a result of the traffic stop and the warrantless entry of her home. She argued that the traffic stop was unlawful on the ground that Officer Forrest did not have a reasonable, articulable suspicion that she had violated a traffic law. She also argued that Officer Forrest and Sergeant Murphy did not have probable cause to arrest her and that there were no exigent circumstances to justify the warrantless entry of her home. In January 2024, the district court filed an order in which it denied Mangen's motion.

In July 2024, the parties agreed that the state would dismiss count 2, that count 1 would be tried to the court on stipulated evidence, that appellate review would be limited

4

to the ruling on Mangen's pre-trial motion, and that the pre-trial ruling would be dispositive of the case. *See* Minn. R. Crim. P. 26.01, subd. 4. The district court found Mangen guilty of count 1. Mangen appeals and renews the arguments that she presented to the district court.

## ISSUES

I.      Was Officer Forrest's stop of Mangen's vehicle justified by a reasonable, articulable suspicion of a traffic violation?

II.      Was the officers' warrantless entry into Mangen's home justified by probable cause and exigent circumstances?

## ANALYSIS

### I.

Mangen first argues that the district court erred by concluding that Officer Forrest had a reasonable, articulable suspicion of criminal activity when he initiated the traffic stop.

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV; *see also* Minn. Const. art. I, § 10. The Fourth Amendment also protects the right of the people to be secure in their motor vehicles. *Delaware v. Prouse*, 440 U.S. 648, 653-55 (1979); *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000). But a law-enforcement officer may, consistent with the Fourth Amendment, briefly detain a person in a motor vehicle for purposes of a limited investigation if the officer has a reasonable, articulable suspicion that the person might be engaged in criminal

5

activity. *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (citing *Terry v. Ohio*, 392 U.S 1 (1968)).

A reasonable, articulable suspicion exists if "the police officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The reasonable-suspicion standard is not high, but the suspicion must be more than a "mere hunch." *State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021) (quotation omitted). "Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle." *State v. George*, 557 N.W.2d 575, 578 (Minn. 1997). In reviewing a district court's ruling on a motion to suppress evidence, this court applies a clear-error standard of review to a district court's findings of fact and a *de novo* standard of review to the district court's legal conclusions. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

Mangen's argument is focused on the district court's finding that Officer Forrest saw her commit a traffic violation. Mangen concedes that driving on or crossing over the center line is a violation of a traffic law and that such a violation may provide reasonable, articulable suspicion for a traffic stop. *See* Minn. Stat. § 169.18, subd. 7(1) (2022) (requiring vehicle to be driven "as nearly as practicable entirely within a single lane"); *see also State v. Richardson*, 622 N.W.2d 823, 825-26 (Minn. 2001) (concluding that officer had reasonable suspicion of criminal activity because driver crossed and recrossed fog line); *State v. Schinzing*, 342 N.W.2d 105, 106, 109 (Minn. 1983) (concluding that officer had reasonable suspicion because driver committed multiple "violations of the traffic laws," including "crossing over into the opposite lane of traffic"); *Soucie v. Commissioner*

*of Public Safety*, 957 N.W.2d 461, 463-65 (Minn. App. 2021) (concluding that officer had reasonable suspicion because driver's car's tires touched fog line), *rev. denied* (Minn. June 29, 2021); *Kruse v. Commissioner of Public Safety*, 906 N.W.2d 554, 558-60 (Minn. App. 2018) (concluding that officer had reasonable suspicion because driver drove on fog line). But Mangen contends that the evidentiary record does not support the district court's finding that her vehicle crossed the center line.

The district court addressed this issue with specificity in its order denying Mangen's motion to suppress. The district court found that Officer Forrest "observed a red Toyota minivan in front of him appear to cross the centerline of the street." The district court analyzed the evidence as follows:

> [T]he squad video does not clearly depict any driving conduct that is an obvious violation of traffic rules. The video was taken at night, and Officer Forrest was at least one block behind Defendant's vehicle when the video began. However, the vehicle does appear to drive close to the center road and possibly to stray briefly over the center of the road. The video certainly does not discredit the testimony of Officer Forrest. The officer's testimony about his interactions with Defendant was consistent with and corroborated in material aspects by . . . the body cam video. This increases the likelihood that the officer testified truthfully about his observations of Defendant's vehicle . . . . Finally, Defendant's vehicle did make a significant weave to the right after driving along the center of the road. Officer Forrest did not decide to stop Defendant's vehicle due only to mere whim or caprice. He had a reasonable and articulable basis to effectuate the stop. The stop/seizure of Defendant was therefore not unlawful.

The district court's finding that Officer Forrest saw Mangen's vehicle cross the center line is supported by Officer Forrest's testimony at the suppression hearing. He testified, "When I was driving behind the vehicle, it appeared to drive onto and cross over

7

the center line." Mangen's attorney cross-examined Officer Forrest briefly on that issue but did not elicit any testimony that contradicted Officer Forrest's testimony on direct examination. Officer Forrest agreed with Mangen's attorney that the dashboard camera's videorecording is a "fairly accurate" "depiction of what took place." But a district court's finding of fact is not clearly erroneous simply because a videorecording does not corroborate an officer's observation of an event, so long as the videorecording does not contradict the officer's testimony. *See Alahapperuma v. Commissioner of Public Safety*, No. A23-1154, 2024 WL 1987642, at *3 (Minn. App. May 6, 2024); *State v. Elder*, No. A21-1324, 2022 WL 16910605, at *3 (Minn. App. Nov. 14, 2022); *State v. Finley*, No. A18-1597, 2020 WL 132168, at *3-4 (Minn. App. Jan. 13, 2020), *rev. denied* (Minn. Mar. 25, 2020); *see also* Minn. R. Civ. App. P. 136.01, subd. 1(c) (providing that nonprecedential opinions are "not binding authority" but "may be cited as persuasive authority"). Thus, the district court did not clearly err by finding that Officer Forrest saw Mangen's vehicle cross over the center line.

Mangen also challenges the district court's finding that her vehicle "made a significant weave to the right after driving along the center of the road." Officer Forrest did not testify that he observed weaving. The district court apparently made this finding based on its review of Officer Forrest's dashboard-camera videorecording. The caselaw makes clear that weaving within a lane of traffic, by itself, may provide the reasonable suspicion necessary to justify a traffic stop. *See State v. Kvam*, 336 N.W.2d 525, 528 (Minn. 1983); *State v. Ellanson*, 198 N.W.2d 136, 137 (Minn. 1972); *State v. Dalos*, 635 N.W.2d 94, 96 (Minn. App. 2001). In any event, this finding is not critical to the validity

8

of the traffic stop, which is justified by Officer Forrest's observation of Mangen's vehicle crossing over the center line.

Thus, the district court did not err by concluding that Officer Forrest's traffic stop of Mangen's vehicle is justified by a reasonable, articulable suspicion of criminal activity.

**II.**

Mangen also argues that the district court erred by concluding that the officers' warrantless entry into her home is justified by probable cause and exigent circumstances.

As stated above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV; *see also* Minn. Const. art. I, § 10. In addition, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend IV; *see also* Minn. Const. art. I, § 10. A person's right "to retreat into [one's] own home and there be free from unreasonable government intrusion" is at the "very core" of the Fourth Amendment's protections, *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quotation omitted), and the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313 (1972).

Accordingly, a law-enforcement officer must obtain a warrant before entering a home to make an arrest, and an officer's warrantless entry of a home is presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Payton v. New York*, 445 U.S. 573, 586 (1980); *State v. Lohnes*, 344 N.W.2d 605, 610 (Minn. 1984). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant

9

requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403. Accordingly, a warrantless entry of a home may be reasonable if a law-enforcement officer has probable cause to conduct a search or seizure inside the home and enters the home pursuant to a recognized exception to the Fourth Amendment's warrant requirement. *Id.*; *Payton*, 445 U.S. at 588-90; *State v. Thompson*, 578 N.W.2d 734, 740 (Minn. 1998).

**A.**

Mangen first contends that Officer Forrest and Sergeant Murphy did not have probable cause to arrest her when they entered her home without a warrant.

"Probable cause to arrest exists when a person of ordinary care and prudence, viewing the totality of circumstances objectively, would entertain an honest and strong suspicion that a *specific* individual has committed a crime." *State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011) (quotation omitted). Probable cause for a DWI arrest may include slurred speech, bloodshot eyes, an unsteady gait, and the odor of alcohol, as well as driving conduct, such as touching the center line while driving. *State v. Koppi*, 798 N.W.2d 358, 365 (Minn. 2011). "An officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence." *State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004). Appellate courts apply a *de novo* standard of review to the question whether the facts and circumstances give rise to probable cause for an arrest. *State v. Glover*, 4 N.W.3d 124, 132 (Minn. 2024).

In this case, the district court reasoned that Officer Forrest had probable cause to arrest Mangen for DWI based on his "interactions with [her], which included having her perform field sobriety tests." The district court's reasoning is supported by the evidentiary

record. Officer Forrest testified that, during his face-to-face interactions with Mangen, which lasted approximately ten minutes, he observed that she fumbled while looking for her driver's license and insurance documentation, was unsteady on her feet, had glassy eyes, smelled of alcohol, was slow in responding to his questions, and admitted to having consumed "a couple of beers." In addition, Mangen performed poorly on three field sobriety tests. Before Officer Forrest initiated the traffic stop, he saw Mangen drive onto and cross over the center line. The information available to Officer Forrest easily satisfies the standard of an objectively reasonable belief that Mangen was driving while impaired. *See Otto v. Commissioner of Public Safety*, 924 N.W.2d 658, 662-63 (Minn. App. 2019); *Reeves v. Commissioner of Public Safety*, 751 N.W.2d 117, 120 (Minn. App. 2008); *State v. Prax*, 686 N.W.2d 45, 48-49 (Minn. App. 2004), *rev. denied* (Minn. Dec. 14, 2004); *Kier*, 678 N.W.2d at 678; *State v. Driscoll*, 427 N.W.2d 263, 265-66 (Minn. App. 1988).

Thus, the district court did not err by concluding that Officer Forrest had probable cause to arrest Mangen for DWI when he and Sergeant Murphy entered her home without a warrant.

**B.**

Mangen also contends that the district court erred by concluding that the officers' warrantless entry of her home is justified by exigent circumstances.

As stated above, a warrantless entry of a home may be reasonable if a law-enforcement officer has probable cause to make an arrest inside the home and enters the home pursuant to a recognized exception to the Fourth Amendment's warrant requirement. *Payton*, 445 U.S. at 588-90; *Thompson*, 578 N.W.2d at 740. The United States Supreme

11

Court has recognized certain categories of exigent circumstances in which "there is compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (quotation omitted). In these circumstances, "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quotation omitted). The state bears the burden of proving the existence of exigent circumstances. *State v. Trahan*, 886 N.W.2d 216, 222 (Minn. 2016).

In this case, Mangen challenges the district court's conclusion that Officer Forrest's warrantless entry of her home is justified by exigent circumstances arising from the officer's hot pursuit of Mangen. A law-enforcement officer's "hot pursuit of a fleeing suspect" is a recognized category of exigent circumstances. *King*, 563 U.S. at 460; *see also Brigham City*, 547 U.S. at 403. The hot-pursuit doctrine arises from *United States v. Santana*, 427 U.S. 38 (1976), in which the suspect was standing in her open front doorway and "retreated into the vestibule of her house" when she saw police officers approaching her. *Id.* at 40-41. "The officers followed through the open door, catching her in the vestibule." *Id.* at 40. The Supreme Court held that the suspect's arrest complied with the Fourth Amendment because the officers first sought to arrest her in a public place and were in "hot pursuit" of her. *Id.* at 42-43. The Court reasoned that "a suspect may not defeat an arrest which has been set in motion in a public place." *Id.* at 43. The Court's reasoning followed from the principle that "the warrantless arrest of an individual in a public place upon probable cause [does] not violate the Fourth Amendment." *Id.* at 42 (citing *United States v. Watson*, 423 U.S. 411 (1976)).

12

# 1.

Mangen first contends that Officer Forrest was not actually in hot pursuit of her when he and Sergeant Murphy entered her home. The record shows that, before Mangen fled, Officer Forrest had stopped her vehicle, had spoken to her for approximately ten minutes, and had administered three field sobriety tests. Officer Forrest told Mangen to stand by her vehicle while he retrieved a PBT device from his squad car. During the short 20-second period in which Officer Forrest retrieved the PBT device, Mangen left the driveway area, entered her home, and locked the door. When Officer Forrest realized that she was not standing near her vehicle as he had requested, he immediately ran toward the back door of her home.

This case presents even more of a hot pursuit than the facts of *Santana*, in which the officers' pursuit of the suspect "ended almost as soon as it began," which prompted the Court to explain that hot pursuit "need not be an extended hue and cry 'in and about [the] public streets.'" *Id.* at 43. The pursuit in this case is similar to the pursuit in *State v. Paul*, 548 N.W.2d 260 (Minn. 1996), in which the officer initiated a traffic stop by activating his emergency lights and following the suspect on a highway and a city street. *Id.* at 262-63. The suspect pulled into his driveway, parked his vehicle, hastily went toward his garage, entered his home, and locked the door behind him, all while the officer ordered him to stop. *Id.* at 262-63, 265. The supreme court concluded that the officer was in hot pursuit of the suspect because the officer "set in motion an arrest which Paul could not stop by retreating into his home." *Id.* at 265. As was true in both *Santana* and *Paul*, Mangen's arrest had been "set in motion in a public place," which means that she "may not defeat" such an

13

arrest by fleeing.  *See Santana*, 427 U.S. at 43; *Paul*, 548 N.W.2d at 265.  Thus, Officer Forrest was in "hot pursuit" of Mangen when he and Sergeant Murphy entered her home.

**2.**

Mangen contends further that, even if Officer Forrest was in hot pursuit, the warrantless entry of her home is not justified on the ground that "there were no other exigent circumstances."

After *Santana*, courts differed in their application of the hot-pursuit doctrine in cases of suspected *misdemeanor* offenses.  In 2013, the Supreme Court observed that "federal and state courts nationwide are sharply divided on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (*per curiam*). In 2021, the Supreme Court clarified that an officer's hot pursuit of a suspected misdemeanant is *not* an exigent circumstance as a categorical matter. *Lange v. California*, 594 U.S. 295, 308-09 (2021).  Rather, courts must "assess[] case by case the exigencies arising from misdemeanants' flight." *Id.* at 308.  "When the totality of circumstances shows an emergency . . . the police may act without waiting." *Id.*  "But the need to pursue a misdemeanant does not trigger a categorical rule allowing home entry" in the absence of "a law enforcement emergency." *Id.* at 308-09.  "When the nature of the crime, the nature of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home—which means that they must get a warrant." *Id.* at 309.

We interpret *Lange* to require, in the case of an officer's hot pursuit of a person suspected of a misdemeanor offense, a case-by-case, totality-of-the-circumstances analysis

14

that considers the three factors specifically identified in the *Lange* opinion: "the nature of the crime, the nature of the flight, and surrounding facts." *Id.* Furthermore, in considering the third factor, "surrounding facts," we interpret *Lange* to require courts to consider the examples of emergencies identified in *Lange*: "imminent harm to others, a threat to the officer himself, destruction of evidence, [and] escape from the home." *Id.* at 308.[1]

To apply the *Lange* analysis to the facts and circumstances of this case, we begin with the first factor identified in *Lange*, "the nature of the crime." *Id.* at 309. The *Lange* Court stated that the "'gravity of the underlying offense'" generally "is 'an important factor to be considered when determining whether any exigency exists'" and that "'there is reason to question whether a compelling law enforcement need is present'" if the suspected offense is "'only a minor offense.'" *Id.* at 306 (quoting *Welsh v. Wisconsin*, 466 U.S. 740,

---

[1] It appears that this court has applied the hot-pursuit doctrine to suspected misdemeanants in a categorical manner, which is inconsistent with the case-by-case, totality-of-the-circumstances analysis prescribed by *Lange*. *See State v. Morin*, 736 N.W.2d 691, 694-96 (Minn. App. 2007) (fleeing police officer on foot), *rev. denied* (Minn. Sept. 18, 2007); *Steinbrenner v. Commissioner of Public Safety*, 413 N.W.2d 557, 559 (Minn. App. 1987) (erratic driving and DWI); *Pahlen v. Commissioner of Public Safety*, 382 N.W.2d 552, 553-54 (Minn. App. 1986) (speeding). Similarly, the district court in this case analyzed the issue in a categorical way by discussing *Paul* and concluding that "*Paul* is directly on point." But we do not interpret *Paul* to say that hot pursuit, by itself, is a sufficient exigency. The defendant in *Paul* argued that "a police officer may not make a warrantless entry into a home to make an arrest for an offense of lesser magnitude than a felony." 548 N.W.2d at 265. The supreme court commented that the defendant "essentially asks this court . . . to adopt a bright-line rule prohibiting warrantless arrests in the home when the underlying offense is of lesser magnitude than a felony." *Id.* at 266. The supreme court expressly rejected such a bright-line rule. *Id.* at 267-68. The *Paul* court resolved the issue by identifying multiple reasons for a finding of exigent circumstances: the officer was in hot pursuit of Paul before he entered his home, there was a need to preserve evidence of Paul's blood-alcohol level, and the suspected offense (DWI) was a serious offense. *Id.* at 266-67.

15

750, 753 (1984)).  The Court also noted that misdemeanors "vary widely" and "run the gamut of seriousness" but that the label usually applies to "less violent and less dangerous crimes" and "usually limits prison time to one year."  *Id.* at 305.

In this case, Mangen was suspected of having committed the offense of DWI, which, in Minnesota, ordinarily is a misdemeanor offense, so long as the offender does not have recent prior DWI offenses.  *See* Minn. Stat. §§ 169A.20, subd. 3, 169A.27 (2024).  The maximum period of incarceration for a misdemeanor offense is 90 days.  Minn. Stat. § 169A.03, subd. 12 (2024).  But a DWI charge may be enhanced to a gross misdemeanor if a person has a prior DWI conviction within the previous ten years.  Minn. Stat. §§ 169A.26, subds. 1(a), 2 (2024), 169A.095 (2024).  The maximum period of incarceration for a gross misdemeanor offense is 364 days, and a person convicted of gross-misdemeanor DWI must serve a minimum of 30 days.  Minn. Stat. §§ 169A.03, subd. 8, 169A.26, subd. 2, 169A.275, subd. 1(a)(1) (2024).[2]  In addition, a DWI charge may be enhanced to a felony if, among other possibilities, the person has three or more prior DWI convictions within the previous ten years.  Minn. Stat. § 169A.24, subds. 1(1), 2 (2024).  A person convicted of felony DWI must be sentenced to at least three years of imprisonment and a maximum of seven years.  Minn. Stat. §§ 169A.24, subd. 2, 169A.276, subd. 1(a)(1) (2024).

---

[2]In this case, Mangen was charged with third-degree DWI, a gross misdemeanor, based on a prior conviction of DWI within the previous ten years.  But Mangen's prior conviction presumably was not known to Officer Forrest and Sergeant Murphy when they entered her home, so the enhancement to Mangen's DWI charge is not relevant to our analysis of the warrantless entry of her home.

In *Paul*, the supreme court considered the relative gravity of the misdemeanor offense of DWI and determined that it is a "serious" offense. 548 N.W.2d at 267-68. At that time, a DWI could be enhanced only to a gross misdemeanor, not to a felony. *See* Minn. Stat. § 169.121, subd. 3(b)-(c) (1992). The legislature amended the DWI statutes to allow enhancement to a felony in 2001. *See* 2001 Minn. Laws 1st Spec. Sess. ch. 9, art. 19, § 4, at 2696. In addition, since *Paul*, the United States Supreme Court has emphasized the seriousness of the offense by noting that "[a]lcohol consumption is a leading cause of traffic fatalities and injuries" and that, in one recent year, such fatalities occurred, "on average," once "every 53 minutes." *Birchfield v. North Dakota*, 579 U.S. 438, 465 (2016). Consequently, in Minnesota, DWI is not a typical misdemeanor. The offense frequently endangers others, and it may be a felony, with a minimum prison sentence of three years and a maximum of seven years. *See* Minn. Stat. §§ 169A.24, subd. 2, 169A.276, subd. 1(a)(1). Thus, the serious nature of the offense of which Mangen was suspected indicates the existence of exigent circumstances when Officer Forrest and Sergeant Murphy entered Mangen's home without a warrant.

The second factor identified in *Lange* is "the nature of the flight." *Id.* at 309. The *Lange* Court stated, "In misdemeanor cases, flight does not always supply the exigency that this Court has demanded for a warrantless home entry." *Id.* at 308. The Court noted that some suspects flee because they are "intent on discarding evidence" or have "a willingness to flee yet again," while other suspects "may flee for innocuous reasons and in non-threatening ways." *Id.* at 307.

Mangen's flight was not of the "innocuous" variety described in *Lange*. *See id.* Likewise, Mangen's flight was not ambiguous in nature, as in some other hot-pursuit cases. *See, e.g.*, *Morin*, 736 N.W.2d at 694-96 (underage university student outside house party made eye contact with police officer in public place, acted "startled," and ran into house). Rather, Mangen obviously fled with the goal of frustrating Officer Forrest's investigation and evading her eventual arrest. Mangen's flight is especially egregious because she agreed to take a PBT and took advantage of the fact that Officer Forrest did not detain her in his squad car or restrain her with handcuffs. In addition, she had ample time to reflect, which indicates that her decision to flee was deliberate and calculated. Thus, the nature of Mangen's flight supports a determination that exigent circumstances existed when Officer Forrest and Sergeant Murphy entered Mangen's home without a warrant.

The third factor identified in *Lange* is the "surrounding facts." *Id.* at 309. As stated above, the *Lange* Court identified a few facts and circumstances that may give rise to an emergency that might justify a warrantless entry of a home for the arrest of a suspected misdemeanant: "imminent harm to others, a threat to the officer himself, destruction of evidence, [and] escape from the home." *Id.* at 308.

The first two examples—a risk of imminent harm to others and a threat to an officer—do not appear in the record of this case. Officer Forrest and Sergeant Murphy did not testify that they perceived either of these two risks, and no such risks are evident in the videorecording created by Officer Forrest's body-worn camera.

The third example identified in *Lange*—destruction of evidence—is present in this case. The Supreme Court has stated, "It is true that as a result of the human body's natural

18

metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated." *McNeely*, 569 U.S. at 152. The natural dissipation of evidence of a DWI suspect's blood-alcohol concentration is not, by itself, a sufficient reason for an exception to the warrant requirement but may, in combination with other circumstances, satisfy the exigent-circumstances exception. *Id.* at 149-56; *see also Mitchell v. Wisconsin*, 588 U.S. 840, 847-57 (2019) (drunk-driving suspect was unconscious and, thus, unable to consent to breath test); *Schmerber v. California*, 384 U.S. 757, 770-71 (1966) (drunk-driving suspect had caused automobile accident, which required officer's attention); *State v. Stavish*, 868 N.W.2d 670, 677-78 (Minn. 2015) (DWI suspect caused fatal automobile accident, was hospitalized, and might have been airlifted to different hospital). In addition, if a DWI suspect is inside his or her own home, there is a risk that the suspect will intentionally cause the destruction of reliable evidence by consuming more alcohol. *See Paul*, 548 N.W.2d at 267 (citing *State v. Storvick*, 428 N.W.2d 55, 58 (Minn. 1988) (vehicular-homicide suspect informed officer that he drank alcohol after arriving home)). Thus, the risk of destruction of evidence also supports a determination that exigent circumstances existed when Officer Forrest and Sergeant Murphy entered Mangen's home without a warrant.

The fourth example identified in *Lange*—the risk of an escape from the home—is not present in the record. The state did not introduce any evidence at the suppression hearing concerning the risk that Mangen might flee from her home to avoid further investigation and arrest. As a result, there is no evidence concerning the practicality of

monitoring all exits of Mangen's home to ensure that she could not escape before officers could obtain a warrant.

The four examples of surrounding facts and circumstances identified in *Lange* are not exhaustive. *See* 594 U.S. at 308. One additional fact is important to the exigent-circumstances analysis in this case: the fact that Officer Forrest and Sergeant Murphy entered Mangen's home peaceably, without using force. The officers knocked on the door until Mangen unlocked it and opened it. The officers initially spoke with Mangen through the open door. Before entering, Sergeant Murphy told Mangen that the officers were "going to step in." The officers' entry did not result in any injury to Mangen or any damage to her home. These facts support a determination that the warrantless entry in this case was reasonable. *See Brigham City*, 547 U.S. at 406-07 (stating that "manner" of officers' warrantless entry of home "was . . . reasonable"); *State v. Gray*, 456 N.W.2d 251, 256 (Minn. 1990) (considering, as part of exigent-circumstances analysis, whether "peaceable entry was made" and whether injury was prevented); *Lohnes*, 344 N.W.2d at 612 (noting that "entry to defendant's abode was peaceable"); *see also Lange*, 594 U.S. at 301 (stating that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'" (quotation omitted)).

To sum up: Mangen was suspected of a serious crime that exposes others to danger and usually is a misdemeanor but may be enhanced to a felony. Mangen's flight was deliberate and obviously designed to avoid further investigation and arrest. Mangen's flight created a risk of destruction of evidence because of both additional delay and the possibility that she might have consumed more alcohol inside her home. And officers

20

entered Mangen's home in a peaceable manner. The totality of the circumstances leads to the conclusion that exigent circumstances were present that justify the officers' warrantless entry of Mangen's home.

Thus, the district court did not err by concluding that the exigent-circumstances exception to the warrant requirement applies. As a consequence, the district court did not err by concluding that the officers' warrantless entry into Mangen's home is justified by probable cause and exigent circumstances.

## DECISION

In sum, the district court did not err by denying Mangen's motion to suppress evidence.

**Affirmed.**